Gardens of Faith, Inc. v. Commissioner. Raymond F. Cushing and Kathryne R. Cushing v. Commissioner.
Gardens of Faith, Inc. v. Commissioner
Docket Nos. 1362-62, 1363-62.
United States Tax Court
T.C. Memo 1964-178; 1964 Tax Ct. Memo LEXIS 154; 23 T.C.M. (CCH) 1045; T.C.M. (RIA) 64178; June 30, 1964
John Y. Merrell, Shoreham Bldg., Washington, D.C., for the petitioners. Stuart E. Seigel for the respondent. KERN Memorandum Findings of Fact and Opinion In these consolidated proceedings respondent determined deficiencies in petitioners' Federal income taxes in the amounts and for the years as follows: Year or
Docket No.
Petitioner
Fiscal Year
Deficiency
1362-62
Gardens of Faith, Inc.
May 31, 1958
$69,723.16
1362-62
Gardens of Faith, Inc.
May 31, 1959
60,718.56
1362-62
Gardens of Faith, Inc.
May 31, 1960
52,458.54
1363-62
Raymond F. and Kathryne R. Cushing
1957
12,767.86
1363-62
Raymond F. and Kathryne R. Cushing
1958
15,412.34
1363-62
Raymond F. and Kathryne R. Cushing
1959
25,687.51
*155 In addition to the above deficiencies, respondent claimed in an amended answer additional deficiencies against Raymond F. and Kathryne R. Cushing in the amounts of $20,951.14, $21,873.42, and $15,766.50 for the years 1957, 1958, and 1959, respectively, pursuant to section 6214(a) of the Internal Revenue Code of 1954. [1]
Several of the issues raised in the pleadings have been settled by the parties and will be given effect in Rule 50 computations. The only issue presented for our decision in Docket No. 1362-62 is whether the respondent erred in disallowing deductions claimed by Gardens of Faith, Inc., in each of the fiscal years in issue for amounts paid upon its certificates of indebtedness and claimed to represent the cost of land sold. The remaining issues are raised in Docket No. 1363-62. The first is whether the respondent erred in determining that the amounts received by petitioners in each of the years in issue with respect to certificates of indebtedness issued by Gardens of Faith, Inc., constituted dividends taxable as ordinary income, *156 and not, as petitioners contend, amounts received in exchange for the certificates of indebtedness to be first treated as a recovery of cost and then as long-term capital gain pursuant to section 1232. A similar issue is presented for our decision with respect to amounts received by petitioners in each of the years in issue on certificates of indebtedness issued by another cemetery corporation. Evergreen Memorial Gardens, Inc. The final issue presented for our decision is whether certain cemetery lots sold by petitioners in 1957 in still another cemetery, Belair Memorial Gardens, Inc., were held by them for sale to customers in the ordinary course of their trade or business so that the gain therefrom constitutes ordinary income as determined by respondent, or whether such gain constitutes long-term capital gain from the sale or exchange of capital assets as claimed by petitioners. The amount of a deduction for medical expense claimed in petitioners' 1957 return was reduced by respondent as a result of his other determinations. The proper amount of petitioners' medical expense deduction for 1957 is dependent upon our decision on the issues presented herein and will be computed under *157 Rule 50. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated into and made a part of our Findings by this reference. Petitioner, Gardens of Faith, Inc., sometimes hereinafter referred to as Gardens, is a corporation organized on May 10, 1957, under the laws of the State of Maryland to engage in the cemetery business. Its principal office is located in Baltimore, Maryland. Gardens filed its Federal corporation income tax returns for the fiscal years ended May 31, 1958, 1959, and 1960 with the district director of internal revenue at Baltimore, Maryland. It filed its income tax returns on the accrual method of accounting, except as to certain sales of burial lots which were reported on the installment method of accounting. Petitioner, Raymond F. Cushing, sometimes hereinafter referred to as Cushing, and his wife, petitioner Kathryne R. Cushing, somtimes hereinafter referred to as Kathryne, reside at Kingsville, Baltimore County, Maryland. They filed joint Federal income tax returns on the cash method of accounting for the calendar years 1957, 1958, and 1959 with the district director *158 of internal revenue at Baltimore, Maryland. Cushing has been in the cemetery business for approximately 25 years. Since 1945 he has been a cemetery owner and operator, and at the time of trial herein he had a proprietary interest in four cemeteries. Prior to 1945 he was employed by various cemetery companies as a salesman of cemetery lots. Cushing's first venture as a cemetery owner and operator consisted of a small unzoned tract of approximately 6 1/2 acres which he and his wife purchased, developed, and operated as a partnership. The venture was incorporated in 1947 and was from that time known as Belair Memorial Gardens, Inc. It will sometimes hereinafter be referred to as Belair. Cushing and his wife have owned all the stock of Belair from the time of its incorporation. Belair is not a big venture but it has been a profitable one. Sales of lots by Belair were made in excess of the amount of such sales anticipated by Cushing. Several purchases of adjoining land resulted in the cemetery's expansion from approximately 6 1/2 acres to approximately 40 acres. The acquisition of the additional parcels of land required all of Belair's financial resources and as a result it could not *159 pay Cushing the salary it owned him in the years 1950 and 1953. Cushing accepted certain cemetery lots from Belair in these years in lieu of cash for his salary. At the time Cushing acquired these cemetery lots it was his intention that Belair would reacquire them from him for ultimate sale to its customers. These lots were resold, in bulk, by Cushing to Belair in May 1957 at a gain of $12,100. Cushing resold them to Belair in order to raise capital he needed for other cemetery ventures which shall be discussed in detail in these Findings. Cushing never owned nor sold cemetery lots on his own account other than the sale of the lots to Belair in May 1957. On his 1957 return Cushing reported the gain from the sale of the lots to Belair as long-term capital gain. Respondent determined that Cushing's gain constituted ordinary income from the sale of property held by Cushing primarily for sale to customers in the ordinary course of his trade or business. Cushing perceived that there was a need for a large memorial park-type cemetery in the Baltimore area. He was therefore interested in acquiring a tract of land in that area upon which he could develop a cemetery that would be beautiful *160 and one of the better cemeteries in the East. In 1949 Cushing considered acquiring for this purpose an undeveloped cemetery located in Baltimore County and known as Kenwood Memorial Park Cemetery, sometimes hereinafter referred to as Kenwood. Cushing had been unsuccessful in obtaining the appropriate zoning for other tracts of land he was interested in acquiring for the purpose of developing into a cemetery. Kenwood was approximately a 100-acre tract dedicated to cemetery purposes prior to the advent of zoning. No interments were made there although approximately 1,650 lots were sold to a small group of people. When Cushing examined Kenwood in 1949 it had no improvements and it was being used as a playground for children. Title to Kenwood was not merchantable in Cushing's opinion, because the previous sale of lots had to be honored and the purchasers would have to be located, and because Kenwood had become insolvent and was involved in litigation among stockholders, trustees, and lot owners. While Cushing was seeking ways and means to finance the purchase of Kenwood and waiting for the termination of the litigation affecting its title, he participated in the organization of a cemetery *161 in Carroll County, Maryland, known as Evergreen Memorial Gardens, Inc., sometimes hereinafter referred to as Evergreen. Evergreen is a corporation organized on November 7, 1955, under the laws of the State of Maryland with its principal offices in Finksburg, Maryland. It is not a petitioner in the instant case. Cushing undertook the Evergreen venture with two other principals, Nelson E. Walrath, sometimes hereinafter referred to as Walrath, and Harrison J. Chubb, sometimes hereinafter referred to as Chubb. Cushing was to handle the development and maintenance of the property, Walrath was to raise capital, and Chubb was to be sales director. Due to the nature of cemetery operations, it is difficult to borrow funds from lending institutions or to raise finances by selling corporate stock. Walrath introduced Cushing to an attorney in New York and an accountant in New Jersey, John De Wyn Gaert, sometimes hereinafter referred to as De Wyn Gaert, who explained to Cushing a method of financing the purchase of cemetery property through the issuance of certificates of indebtedness. Cushing was advised that the cemetery could acquire land upon the issuance of certificates of indebtedness, *162 and that the cemetery would not have to pay for its land until it made sales. The amount of payments to be made to the certificate holders would be a percentage of the sales price, and hence would be based upon the success of the cemetery. Cushing was also advised that the payments to the certificate holders in excess of the cost to them of the land conveyed to the cemetery would be taxable at capital gain rates. Cushing, Walrath, Chubb, and several others agreed to finance Evergreen through the use of certificates of indebtedness. They entered into a contract to purchase for $30,000 Evergreen's cemetery land, consisting of approximately 27 acres, and agreed to share the profits and losses as follows: Name
Percentage
Raymond F. Cushing
20.1
Kathryne R. Cushing
18.1
Nelson E. Walrath
3.6
Margot E. Walrath
5.4
Nelson E. Walrath, Jr.
5.4
Harrison J. Chubb
11.1
Billie L. Chubb
10.6
Gerald and Lucille Hammill
5.0
Stanley Levin
5.0
Joseph and Cecil Brenner
5.0
Frank R. Loney, Jr.
3.7
Universal Associates
3.8
Josephine De Wyn Gaert
1.2
Ralph B. Poist
0.5
Mildred A. Poist
1.0
Lawrence Givler
0.5
Total
100.0
Cushing obtained a deed for *163 Evergreen's land on December 6, 1955, for all of the above joint venturers. Pursuant to an agreement of December 6, 1955, between Cushing, as trustee for all the joint venturers, and Evergreen entitled "Evergreen Memorial Gardens Agreement", Cushing conveyed the land to Evergreen in consideration of the issuance by Evergreen of 1,000 registered certificates of indebtedness. Approximately 6 acres were conveyed to Evergreen free of any encumbrance. The remaining acres were conveyed to Evergreen subject to a mortgage in the amount of $12,000. In the Evergreen Memorial Gardens Agreement Cushing promised to satisfy the mortgage out of the proceeds to be paid by Evergreen on the certificates of indebtedness. Evergreen agreed to pay on the certificates of indebtedness 20 percent of the base sales price of all burial space sold in the cemetery for a period of 25 years, beginning with the date the first lot or grave space was sold. Base sales price was defined as the gross purchase price paid by the individual lot or grave space purchaser less the actual cost to Evergreen for discounting and insurance, and, if a cash sale, less the cash discount. The Evergreen Memorial Gardens Agreement also *164 provided that 10 percent of the base sales price would be set aside and deposited with a bank, as trustee, for a perpetual care fund. The joint venturers designated themselves as Class "A" and Class "B" joint venturers to distinguish between those who had given cash or property as consideration for the certificates issued to them (Class A) and those who had given promissory notes for the certificates issued to them (Class B). These certificates were issued to the parties pursuant to the agreement with regard to the sharing of profits and losses above referred to and in conformity with the percentages of participation set out therein, as follows: Class "A" Joint Venturers
Units
Raymond F. Cushing
56
Kathryne R. Cushing
37
Harrison J. Chubb
8
Lucille and Gerald Hammill
50
Stanley Levin
50
Joseph and Cecil Brenner
50
Ralph B. Poist
5
Lawrence Givler
5
261
Class "B" Joint Venturers
Raymond F. Cushing
145
Kathryne R. Cushing
144
Nelson E. Walrath
36
Nelson E. Walrath, Jr.
54
Margot E. Walrath
54
Harrison J. Chubb
103
Billie L. Chubb
106
Frank R. Loney, Jr.
37
Universal Associates
38
Josephine De Wyn Gaert
12
Mildred A. Poist
10
739
*165 The certificates provided in pertinent part as follows: This Is To Certify That… is entitled to an interest equal to… one thousandths (… /1000ths) in Twenty (20%) percent of the proceeds represented by the base sales price of all lots or graves in Evergreen Memorial Gardens sold during a period of Twenty-five (25) years from the sale of the first such lot or grave, as set forth in an agreement between Raymond F. Cushing, as Trustee and Evergreen Memorial Gardens, Inc., dated December 6, 1955 which is incorporated herein by reference. Such proceeds shall constitute the land purchase fund of Evergreen Memorial Gardens, Inc. and shall be accumulated as provided for under paragraph Four (4) of the above referred to agreement. Evergreen Memorial Gardens, Inc., shall be liable to the registered holder of this certificate, and this certificate shall be a lien on such land purchase fund, to the extent of the interest represented by this certificate; and the registered holder of this certificate shall be entitled to have paid over to him such proportion of said fund as the number of one thousand (1000) units. Payments on account of this certificate of indebtedness shall become *166 due on July 1st, 1956, and shall be made at least quarterly thereafter, and shall continue only for such period of time as is necessary to pay out in full the amount accumulated in the land purchase fund. After all such payments are made, the liability of Evergreen Memorial Gardens, Inc., under this certificate of indebtedness shall terminate, and the obligation represented by this certificate shall be discharged. The joint venturers appointed Cushing as their agent to receive all payments from Evergreen on the certificates of indebtedness. Cushing, as agent, was directed to pay, beginning August 1, 1955, and at least quarterly thereafter, one-third of the proceeds to the bank holding the $12,000 mortgage on Evergreen's land, and the remainder was to be divided into 1,000 units. The amounts to which the Class "A" joint venturers were entitled were to be disbursed to them. The amounts to which the Class "B" joint venturers were entitled were to be retained by Cushing as trustee and applied to reduce their indebtedness on notes given to Cushing. Upon satisfaction of the indebtedness of the Class "B" joint venturers, distributions were to be made to them as to Class "A" joint venturers. *167 Upon satisfaction of the $12,000 mortgage, all of the amounts received from Evergreen by Cushing as trustee were to be paid over to the certificate holders. Cushing, Walrath, and Chubb were Evergreen's first directors. Evergreen's authorized capital stock was 300 shares of $10 par value. Evergreen also borrowed $2,005 from Cushing "for use as capital surplus," and gave its note in this amount to Cushing payable in 6 months with interest at 5 percent. The authorized stock was originally issued on December 19, 1955, as follows: Number
of Shares
Raymond F. Cushing
40
Kathryne R. Cushing
40
Ralph B. Poist
15
Harrison J. Chubb
95
Nelson E. Walrath
35
Nelson E. Walrath, Jr.
60
Ralph R. Loney, Jr.
15
Total
300
The record does not disclose the amount of cash or other property, if any, paid or transferred to Evergreen in exchange for its stock. On December 31, 1955, the following entries were made in Evergreen's general journal: (1)
Capital Stock Unissued [1]
$ 3,000.00
Capital Stock Authorized
$ 3,000.00
To record the incorporation of Evergreen
Memorial Gardens, Inc. under the laws of Mary-
land on the 7th day of November 1955. The
Capital Stock authorized by the charter of incor-
poration is 300 shares of $10.00 par value; the
duration of the corporation is perpetual and the
Registered Agent is Nelson E. Walrath.
(2)
Subscriptions Receivable [1]
$ 3,000.00
Capital Stock Unissued
$ 3,000.00
To record the complete subscription of original issue: Nelson E. Walrath, Sr.
$ 1,000.00
R. F. Cushing
1,000.00
Harrison J. Chubb
1,000.00
Total: 300 shares
$ 3,000.00
(3)
Cemetery Land
Administration Building
$12,000.00
Certificates of Indebtedness
Mortgage Payable
$12,000.00
To record purchase of the Liebno farm of 28
acres, more or less, from investors syndicate,
subject to lien of Carroll County National Bank.
Refer to agreement dated September 21, 1955.
*168 On July 15, 1961, Cushing purchased 15 shares of Evergreen's stock from Ralph B. Poist. All of Evergreen's stock was placed in escrow pursuant to the Evergreen Memorial Gardens Agreement for the benefit of the trustee of that agreement until such time as Evergreen fulfilled all its obligations under that agreement, including its obligations on the certificates of indebtedness. Evergreen has never declared or paid any dividends on the capital stock it issued. It paid the following amounts in the indicated periods to the holders of the certificates of indebtedness: Year
Amount
1957
$10,298.35
1958
15,314.25
1959
12,535.82 Of the foregoing amounts, the following amounts at the indicated times were distributed to Cushing and his wife: 1957
1958
1959
March 31
$ 216.99
$ 758.10
$1,262.80
June 30
2,076.63
2,093.80
800.80
September 30
1,009.74
1,064.95
924.00
December 31
2,006.19
1,232.00
708.40
Totals
$5,309.55
$5,148.85
$3,696.00
From the time of its organization through 1959 *169 Evergreen spent approximately $38,962.16 for improvement and development costs. Soon after operations began at Evergreen, Cushing became dissatisfied with his association with Walrath and Chubb. Cushing wanted to spend money received from the sale of burial space on the development of the cemetery. Walrath and Chubb, on the other hand, wanted and caused Evergreen's profits to be distributed to the principals. Cushing could not continue in business with Walrath and Chubb, and on March 15, 1957, Cushing agreed to buy out Walrath's and Chubb's interests in Evergreen by purchasing all their stock and certificates in Evergreen for the total sum of $18,300, of which $17,650 was paid for the certificates. Pursuant to the purchase agreement, Walrath, Chubb, and Nelson E. Walrath, Jr., surrendered their stock totaling 190 shares and a stock certificate representing 190 shares of the common stock of Evergreen was issued to Cushing. Also, pursuant to the agreement, Kathryne purchased for $17,650 the 353 units of the certificates of indebtedness held by the vendors. The cost to Cushing and his wife of the certificates of indebtedness issued to them by Evergreen on December 22, 1955, was $17,137. *170 Kathryne had purchased eight units of the certificates of indebtedness from Chubb on December 30, 1955, for $800. The total cost to the Cushings of the certificates of indebtedness originally issued to them and subsequently purchased by them was $35,587. The Cushings sold approximately 391 units of such certificates at various times and to various individuals between December 31, 1955, and October 28, 1958. The total amount for which such certificates was sold does not appear in the record. Gains on these sales for the years 1957 and 1958 were reported on the income tax returns filed by the Cushings as long-term capital gains. Respondent made no adjustments to these items. The Cushings did not include in gross income in their joint Federal income tax returns filed for the years 1957, 1958, and 1959 the amounts distributed to them in these years with respect to their certificates of indebtedness. In his notice of deficiency respondent determined that the amounts received by petitioners as registered holders of such certificates constituted ordinary income and increased the Cushings' gross income accordingly, without making any allowance for the cost of the certificates of indebtedness. *171 After the Evergreen venture was under way, Cushing undertook the Gardens of Faith venture. On February 13, 1956, Cushing obtained an agreement of sale covering the land belonging to Kenwood. Belair was named as the purchaser on the agreement of sale. The principal owners, William J. Seward and Minnie Seward, agreed to sell the land for $200,000, of which $5,000 was paid prior to the signing of the agreement of sale, $27,500 was allowed as a credit on the purchase price by the sellers for the approximate 1,650 lots which were previously deeded or under contract of sale, and $167,500 was to be paid in cash to the sellers on or before 33 days from the date of the agreement of sale. The acquisition of Kenwood's land was a transaction of greater magnitude than any in which Cushing had previously been involved. Cushing himself did not have sufficient capital to acquire Kenwood's land and his principal problem was to obtain financing for the property. He did not want to give up control of the cemetery corporation, and therefore he was unsuccessful in obtaining financing from several individual investors with whom he negotiated, who were only interested in financing a corporation in which *172 they would hold a controlling stock interest. Cushing's experience in the Evergreen venture convinced him that unless he had control of the cemetery corporation he could not be assured that funds would be set aside for development expenses and for perpetual care of the cemetery, which were necessary for the creation and maintenance of a beautiful memorial park. Cemetery corporations were not required by Maryland law to make contributions to a perpetual care fund. One of the reasons why the use of certificates of indebtedness as a means of financing the venture appealed to Cushing was that such certificates allowed Cushing to keep stock control of the cemetery in himself and thereby develop and manage the cemetery in a manner he deemed appropriate. Cushing was also aware of the tax advantages incident to their use. Cushing could not raise the required cash within the time specified in the agreement of sale. He gave the Sewards $6,000 in consideration for an extension of time on the contract. Sometime in April 1956 he was referred to two Baltimore businessmen, John Murray, sometimes hereinafter referred to as Murray, and William Chew, sometimes hereinafter referred to as Chew, whom *173 he was able to interest in investing in the cemetery. Prior to reaching an agreement on the transaction with Cushing, Murray and Chew put up $10,000 which was given to the Sewards to obtain another extension of time on the contract to purchase the Kenwood land. Further negotiations between Cushing on the one hand and Murray and Chew on the other hand were then suspended pending a suit brought by certain stockholders of Kenwood to enjoin the Sewards from selling the property. At the conclusion of this suit in which the Sewards prevailed, Murray and Chew agreed to provide financing for Cushing, and Kenwood's land was sold on November 19, 1956, pursuant to the contract of February 13, 1956. The Sewards received the balance [2] due to them pursuant to the contract of sale, plus $1,000 for an additional lot and they and other owners of record deeded the land to the Guarantee Title Holding Corporation on November 19, 1956, and directed it to hold the land subject to the order of Murray's and Chew's attorneys who were, respectively, Bradley T. J. Mettee, Jr., sometimes hereinafter referred to as Mettee, and R. Samuel Jett, sometimes hereinafter referred to as Jett. *174 Sometime after November 19, 1956, both Chew and his attorney Jett no longer participated in the venture for reasons unknown to Cushing, and Mettee took their place. From then on Cushing dealt with Murray and Mettee. Murray and Mettee participated in the Gardens venture in their individual capacities through trusts known as The John A. Murray Trust and The Bradley T. J. Mettee, Jr., Trust. These trusts were created on May 23, 1957, for the benefit of themselves and their families. The corpus of the trusts consisted of the respective interests of Murray and Mettee in the Gardens venture. Cushing offered Murray and Mettee in return for their investment in Gardens certificates of indebtedness which would pay 20 percent of the base sales price during a period of 25 years. Murray and Mettee at first insisted that they be given sufficient stock to control the corporation in return for their investment. Cushing refused to enter into a venture in which he was not in control. A compromise was reached in which it was agreed to use certificates of indebtedness similar to those which had been used by Cushing in the Evergreen venture. Murray and Mettee agreed to accept certificates which would *175 pay 25 percent of the base sales price during a period of 50 years. Cushing also personally guaranteed Murray's and Mettee's obligations on loans made to finance their investment. Cushing also agreed to the demand of Murray and Mettee that the land be conveyed to the cemetery corporation piecemeal in approximate 10-acre tracts. Upon the sale by Gardens of 50 percent of the available grave space in a tract, the next 10-acre tract would be conveyed to it. By this provision Murray and Mettee retained control of the land not conveyed to Gardens as security for their investment. It would also allow them to use the land for other purposes if the cemetery venture was not a success. Cushing also agreed to allow Murray and Mettee to assume management of the venture if Cushing could not produce a certain minimum sales volume. Murray and Mettee were interested in acquiring a controlling stock interest as security for their investment. They made their investment in the venture upon accepting Cushing's guarantees and other concessions in lieu of a controlling stock interest. In accepting certificates of indebtedness, the terms of which will be hereinafter discussed in more detail, Murray and Mettee *176 intended to obtain tax advantages. They placed their investment at the risks of the business, and expected a return on their investment in proportion to the financial success of the venture. They realized at the time of entering into the venture that if the cemetery's sales program were not successful it was possible that their investment would be lost. Murray and Mettee borrowed approximately $200,000 from a bank. The proceeds of the loan amounted to $191,358.34 which was used in part to purchase the land from the Sewards. Murray and Mettee gave to their bank a note in the principal amount of $200,000, payable in four equal installments semiannually beginning on November 16, 1957. In an agreement with Murray and Mettee, dated May 23, 1957, Cushing personally guaranteed payment of the principal installments due upon the note in the amount of $200,000 signed by Murray and Mettee. Cushing further agreed to cause to be formed petitioner corporation, Gardens of Faith, Inc., to engage in the cemetery business on the land acquired from the Sewards. Pursuant to this contract, the land was to be conveyed to Gardens piecemeal, in parcels of not less than 10 acres. The agreement also provided *177 that beginning. 1 year after the conveyance of the first parcel of land to Gardens on or about May 27, 1958, Cushing guaranteed that the sale of cemetery lots would be not less than $500,000 per year for a total period of 9 years. So long as the guaranteed minimum sales volume was maintained, Cushing was given the right to be the operating head of the cemetery. If the guaranteed minimum sales volume was not attained, Murray and Mettee were given the right to designate a sales manager of their choice. Cushing remained obligated on his guarantee for Murray's and Mettee's $200,000 loan whether or not the minimum annual sales volume was attained. It was agreed that Gardens would issue certain certificates in payment for the land acquired by it, and that payments would be made on these certificates from the proceeds of the sales of burial lots in the cemetery, pursuant to a separate agreement between the parties entitled "Gardens of Faith Agreement." Murray and Mettee were given the right to appoint one of the three directors of Gardens. Gardens was organized on May 10, 1957, and its organizational meeting was held on May 23, 1957. The corporation's authorized capital stock consisted *178 of 1,100 shares of Class A stock with a par value of $50 per share, totaling $55,000, and 100 shares of Class B stock with a par value of $100 per share, totaling $10,000. Of the authorized capital stock of Gardens, 71 shares of Class A stock and 100 shares of Class B stock were issued to Cushing. Cushing has at all times material to this case held such shares of stock representing all of the outstanding stock of Gardens. Cushing gave Gardens a judgment note due in 2 years in the face amount of $13,550 in payment of the subscription price of the capital stock issued to him. Payments were made by Cushing to Gardens in satisfaction of his judgment note as follows: $1,000 on June 1, 1957; $6,550 on August 30, 1958; and $6,000 on May 23, 1959. The officers of Gardens and their respective periods of tenure have been as follows: Name
Office
Dates
Raymond F. Cushing
President
5-23-57 to date
Charles O. Fisher
Vice President
5-23-57 to date
Ralph B. Poist
Secretary-Treasurer
5-23-57 to 7-14-61
Lawrence Givler
Assistant Secretary-Treasurer
6-15-59 to 8-7-61
Lawrence Givler
Secretary-Treasurer
8-7-61 to date
The board of directors of Gardens and their *179 respective periods of tenure have been as follows: Name
Dates
Raymond F. Cushing
5-23-57 to date
Ralph B. Poist
5-23-57 to 6-14-61
John A. Murray
5-23-57 to 6-25-63
Lawrence Givler
8-7-61 to date
In the Gardens of Faith Agreement dated May 23, 1957, entered into between Gardens and Mettee as trustee for and on behalf of Cushing, Murray, and Mettee, the trustee agreed to sell the real estate to Gardens and to provide Gardens with an amount not to exceed $25,000 for use in the development and improvement of the real estate. In return, Gardens agreed to pay to the trustee "a sum equal to Twenty-five percent (25%) of the base sales price of cash and every burial lot or space sold in said cemetery during a period of fifty [years] (50 years from the date hereof) in accordance with the following terms and conditions: (a) The said fifty (50) years shall run for and during the period of the next fifty (50) years beginning on May 27, 1957, and continuing for fifty (50) years thereafter. (b) The Trustee shall be entitled to receive payments made for all sales made during the said fifty (50) year period even though collections and payments thereon are due and *180 made after the termination of said period. (c) The 'base sales price' on which said twenty-five percent (25%) thereof due to the Trustee shall be computed, shall always and in each instance be the gross purchase price paid for the same by the individual lot or grave space purchaser, and if discounted less ten percent (10%) of said gross purchase price retained for discounting cost and insurance and also less ten percent (10%) of the said gross purchase price allocated for the Perpetual Care Fund; and if a cash sale less the cash discount allowed, and also less ten percent (10%) of the gross purchase price allocated to the Perpetual Care Fund, and if an office account (not discounted) less 10% of the gross purchase price allocated to the perpetual care fund." Gardens agreed to issue 1,000 registered certificates of indebtedness, upon which the holders were entitled to a pro rata share of 25 percent of the base sales price of each burial lot. Ten percent of the gross sales price of all sales was deposited by Gardens in a Baltimore bank in a perpetual care fund. The amounts were paid by Gardens into the perpetual care fund at the time that the interment rights were paid in full and *181 a deed or ownership certificate therefor was issued to the purchaser. Cushing, Murray, and Mettee agreed that Cushing would receive 500 certificates of indebtedness from Gardens, and that Murray and Mettee would receive the remaining 500 certificates. Those certificates that were issued for cash invested by the individuals were designated as Class "A" certificates, and those certificates that were represented by loans or notes were designated as Class "B" certificates. The separation of the certificates into "A" and "B" classes was an arrangement among the individuals involved and did not affect Gardens which made payments on all the certificates equally. The holders of the certificates and the number of units owned by each holder were as follows: Class "A"
Certificate Owner
Units
John A. Murray Trust
218 3/4
Bradiley T. J. Mettee, Jr., Trust
218 3/4
Raymond F. Cushing
62 1/2
Total
500
Class "B"
Raymond F. Cushing
437 1/2
John A. Murray Trust
31 1/4
Bradley T. J. Mettee, Jr., Trust
31 1/4
Total
500
The certificates provided, in pertinent part, as follows: This Is To Certify That… is entitled to an interest equal to… one thousandths *182 (… 1000ths) in Twenty-five (25%) percent of the proceeds represented by the base sales price of all lots or graves space or burial space in Gardens of Faith, sold during a period of Fifty (50) years from the sale of the first such lot or grave space or burial space as set forth in an agreement between Bradley T. J. Mettee, Jr., as Trustee and Gardens of Faith, Incorporated, dated May 23, 1957 which is incorporated herein by reference. Such proceeds shall constitute the land purchase Fund of Gardens of Faith, Incorporated, and shall be accumulated as provided for under paragraph Four (4) of the referred to agreement. Gardens of Faith, Incorporated, shall be liable to the registered holder of the certificate, and this certificate shall be a lien on such land purchase fund, to the extent of the interest represented by the certificate; and the registered holder of the certificate shall be entitled to have paid over to him such proportion of said fund as the units represented by this certificate bear to one thousand (1000) units. Payments on account of this certificate of indebtedness shall become due on December 1, 1957, and shall be made at least quarterly thereafter and shall continue *183 for fifty (50) years until the full amount accumulated in the land purchase fund is paid. After all such payments are made, the liability of Gardens of Faith, Incorporated, under this certificate of indebtedness shall terminate, and the obligation represented by this certificate shall be discharged. The consideration given by Cushing for the certificates consisted of a demand note he executed in favor of Murray in the amount of $43,750 and a demand note executed in favor of Mettee also in the amount of $43,750. Murray and Mettee each gave Cushing a demand note for $6,250, and Cushing invested $25,000 in cash in the venture. All of the notes were dated May 23, 1957. Cushing's investment of $25,000, which was referred to in the Gardens of Faith Agreement as an amount for use in the development and improvement of the real estate, was reflected in Gardens' balance sheet as an account entitled "Reserve for Land Development" in the amount of $24,392.34 as an item of its liabilities and capital. The account was in fact not a liability because it would never be paid to anyone. Pursuant to an agreement between Cushing, The John A. Murray Trust, and The Bradley T. J. Mettee, Jr., Trust the *184 amounts to which the Class "A" certificate holders would be entitled from Gardens would be distributed to them. The amounts to which the Class "B" certificate holders were entitled were retained by an agent designated in the agreement and applied to reduce the indebtedness of the Class "B" certificate holders as evidenced by their promissory notes which were held by the agent for collection. The promissory notes referred to were the two $43,750 notes executed by Cushing and the two $6,250 notes executed one each by Murray and Mettee. The agent was authorized to pay over the amounts collected on behalf of Murray and Mettee on the two $43,750 notes executed by Cushing directly to the bank which had loaned Murray and Mettee the cash they put into the venture as payments to the bank on their note instead of paying such amounts to Murray and Mettee personally. Upon satisfaction of the indebtednesses of the Class "B" certificate holders, evidence by the four notes of Cushing, Murray, and Mettee referred to above, the agent was directed to distribute funds to them as in the case of the Class "A" certificate holders. The negotiations between Cushing and Murray and Mettee which resulted in *185 the issuance of the certificates of indebtedness were conducted at arm's length. On May 23, 1957, the following entries were made in the general journal of Gardens: Land and Land Contract
#132
Equipment (Power Saw)
#154
$ 277.06
Furniture and Fixtures
#150
2,239.93
Development Costs
#130
13,846.08
Prepaid Expenses: Sales Supplies
#161
1,277.85
Advertising
#161
830.00
Office Improvements
#161
800.93
Salary-Officers
#161
215.00
Office Rent
#161
375.00
Office Supplies
#161
109.36
Retainer Fee - Sales Consultant
#161
1,500.00
Organization Costs
#167
2,921.13
Reserve for Land Improvements
#243
$24,392.34
Certificates of Indebtedness
#230
The account "Reserve for Land Improvements" in the amount of $24,392.34, which was referred to above, represented a contribution to the capital of Gardens by Cushing. Gardens' balance sheets showed the "Land and Land Contract" acquired among the asset accounts, but no monetary value was stated therefor, and no monetary amount was stated for its liability or its certificates of indebtedness. The explanation given in the balance sheets with respect to these accounts was as follows: "Certificates *186 of Indebtedness have been issued to acquire the 100 acre tract of land, in accordance with terms of agreement dated May 23, 1957. Inasmuch as the land purchase contract does not declare the monetary amount due, there is no calculation of cost possible until final maturity. Likewise, the final liability total is not calculable, except for sales of lots contracted for." Cushing carried out his idea to build a modern, beautiful memorial park in Gardens. Gardens is well landscaped and its embellishments consist of statuary in which the life of Christ is the central theme. All of the statuary works are originals sculptured at Carrara, Italy. There were approximately 90,000 burial spaces available for sale in Gardens. Approximately 7,000 spaces were sold by Gardens in its first year of operations, which was its best year for sales. From the time of commencement of its operations through the years in issue, Gardens' total sales averaged approximately $500,000 a year. In the years 1961 and 1962 the gross sales were slightly less than $500,000 per year. Murray and Mettee did not exercise their privilege pursuant to the Gardens of Faith Agreement of relieving Cushing as manager and sales *187 director of the cemetery. At the time of trial herein all of the land except a small portion of land across the road from Gardens, which served to protect the cemetery from undesirable encroachments, had been conveyed to Gardens. Cushing's 1957 guarantee that the sale of cemetery lots would not be less than $500,000 per year for 9 years contemplated that the total number of lots sold during those 9 years would be approximately 45,000. It is reasonably to be anticipated that all burial spaces in Gardens will be sold within 50 years from the time sales commenced. The price for cemetery lots when Gardens first began its sales program after May 1957 was $87.50 per space. After a period of time, when a significant number of burials take place in a cemetery, a demand for the remaining lots available for sale which are limited in number is created by those who wish to be buried in the same cemetery with their relatives and friends. This phenomenon is known in the cemetery business as heritage. A cemetery's heritage is a valuable asset which sometimes results in a yearly increase in the sale price of the remaining lots available for sale. At the time of trial herein the sale price of cemetery *188 lots in Gardens was slightly in excess of $100 per space. In Cushing's opinion, the average price for all burial lots in Gardens would be approximately $150 per space. In each contract of sale and deed of burial space made by Gardens, Gardens agreed to set aside in trust at least 10 percent of the total receipts in a perpetual care fund. Gardens also agreed in its contracts of sales to spend for general improvements and developments of the cemetery a sum equal to at least 15 percent of the base sales price. The amounts spent by Gardens for development and improvements during the fiscal years ended May 31, 1958, May 31, 1959, and May 31, 1960, were $100,761.61, $64,659.68, and $87,626.35, respectively. Gardens made cash contributions to the principal of a perpetual care fund for the maintenance of the cemetery since the beginning of such fund on July 31, 1958, as follows: Year
Contribution
1958
$ 10,090.85
1959
35,470.66
1960
72,716.80
1961
28,204.46
1962
60,046.90
Through October 1963
26,410.00
Total
$232,939.67
In addition to setting aside 10 percent of the land sales for perpetual care of the cemetery and at least 15 percent for development, Gardens *189 also incurred, in discounting its sales contracts, finance and insurance charges in the approximate amount of 10 percent of sales which were personally guaranteed by Cushing, and commissions paid to salesmen in the approximate amount of 35 percent of sales. The 25 percent of the base sales price (gross sales less 10 percent for financing charges and 10 percent for perpetual care), which was set aside for the certificate holders, constituted 20 percent of gross sales. In all, approximately 90 percent of the gross sales price of land was consumed by these charges leaving approximately 10 percent. of the gross sales for other expenses, such as taxes, advertising, equipment, maintenance, and miscellaneous salaries, and profit, if any. Gardens had other income from the services it performed which were related to its cemetery operations, such as the sale of bronze markers and flowers, and from charges for grave openings. However, the corporate income tax returns filed by Gardens for the fiscal years ended May 31, 1958, May 31, 1959, and May 31, 1960, showed losses in the amounts of $20,553.24, $6,638.65, and $6,782.97, respectively. The taxable income of Gardens after making all allowances *190 for adjustments agreed to by the parties in the stipulation, and allowing for deductions for land purchased in the full amounts claimed by Gardens, was $1,167.60, $2,675.36, and $14,780.94, for the fiscal years ended May 31, 1958, 1959, and 1960, respectively. On May 31, 1957, Cushing transferred his 500 certificates and the two notes he held, each in the amount of $6,250, to his wife in consideration for her judgment note in favor of Cushing for $25,000. Cushing's wife took Cushing's Class "B" certificate subject to the two notes in the amount of $43,750 each in favor of Murray and Mettee, which were to be paid from any sums due under the certificate before any disbursement was made to the registered holder. On February 10, 1959, Cushing's wife made gifts of five certificates each to Ralph B. Poist and Charles O. Fisher. On December 1, 1957, De Wyn Gaert paid $1,250 to Kathryne for twelve certificates which were delivered on February 10, 1959. On February 10, 1959, Kathryne, Mettee, and Murray sold to John A. Spilman 12 1/2, 6 1/4, and 6 1/4 certificates, respectively, at $500 per certificate. The total cost to Kathryne of the certificates transferred to her was $107,300, which *191 amount consists of the note she gave to Cushing in the amount of $25,000, the two notes in favor of Murray and Mettee in the amount of $43,750 each, less two notes received from Cushing each in the amount of $6,250, and legal expenses incurred by Kathryne in the total amount of $7,300 which the parties have stipulated to represent additional cost of Kathryne's certificates in Gardens. Gardens accrued as payable to Mettee, trustee, the following amounts during the fiscal years indicated pursuant to the Gardens of Faith Agreement and the certificates of indebtedness: Fiscal Year Ended
Amount
May 31, 1958
$130,970.45
May 31, 1959
118,808.06
May 31, 1960
103,679.27
Mettee received these funds from Gardens and paid them over to the agent pursuant to the agreement between Cushing, Murray, and Mettee. The above amounts were deducted by Gardens on its Federal income tax returns for the fiscal years indicated as the cost of "land purchased." Respondent disallowed these amounts as deductions but determined that Gardens' basis in the land was equal to the basis of the land in the hands of the transferors, and allowed deductions of $15,516.73, $13,304.55, and $10,399.20, *192 for the fiscal years ended May 31, 1958, 1959, and 1960, respectively, for the cost of land sold. [3]
The notes which Murray and Mettee executed in order to obtain funds for the venture were eventually paid from distributions made to them as certificate holders. Distributions were also made to Murray and Mettee on certificates registered in the name of Cushing's wife because of the two notes executed by Cushing to Murray and Mettee each in the amount of $43,750. These distributions were also used by Murray and Mettee to pay their indebtedness to the bank. From the time of its incorporation to the date of trial herein Gardens has not declared or paid any dividends with respect to the capital stock it issued. Kathryne did not include in gross income in the joint Federal income tax returns filed by her and Cushing for the years 1957 and 1958 the amounts distributed to her in *193 these years with respect to the certificates of indebtedness since these amounts were not in excess of their cost to her. She reported as long-term capital gain in the joint Federal income tax return filed by her and Cushing for 1959 the distributions made to her in 1959 with respect to the certificates of indebtedness in excess of her cost for the certificates. In his notice of deficiency respondent determined that the amounts received by Kathryne in each of the years in issue as a registered holder of such certificates constitute ordinary income to her in such years and increased Cushing's and his wife's gross income accordingly without making any allowance for the cost of the certificates of indebtedness. Opinion KERN, Judge: The first issue presented for our decision is whether, respondent properly determined that Gardens is not entitled to deduct as the cost of land sold, during the years in issue, payments made with respect to its certificates of indebtedness. Respondent contends that the transfer of land used for cemetery purposes to Gardens represented "a transfer of property in exchange for a proprietary equity interest and did not constitute a bona fide sale giving rise *194 to a debtor-creditor relationship." More specifically, respondent contends that the parties in transferring land to Gardens in exchange for certificates of indebtedness did not intend to create a debtor-creditor relationship; that Gardens was undercapitalized, or "thinly" incorporated; that the transaction in the form cast by the petitioners lacked substantial economic reality and therefore may be disregarded for purposes of Federal income taxation; and that the certificates of indebtedness themselves were not, in form, bona fide evidences of indebtedness. In Docket No. 1363-62 respondent contends that the amounts received by Cushing and his wife with respect to the certificates of indebtedness issued by Gardens, to the extent of its earnings and profits, [4] were taxable as dividends. Respondent also contends, in the alternative, that even if there was a bona fide debtor-creditor relationship created between Gardens and the holders of its certificates of indebtedness (1) the certificates do not constitute evidences of indebtedness within the meaning of section 1232[5] so that amounts received by the holders on retirement of such certificates are not "amounts received in exchange *195 therefor," and (2) in any event the certificates do not constitute capital assets in the hands of Cushing or his wife. Petitioners contend that there was a bona fide debtor-creditor relationship created so that the *196 payments made by Gardens with respect to the certificates of indebtedness are deductible by Gardens as the cost of land sold, and such payments to the holders of the certificates constitute first a nontaxable recovery of basis and, second, that amounts received on retirement of such certificates constitute amounts received in exchange therefor pursuant to section 1232 and are taxable at capital gain rates to the extent that such amounts are in excess of petitioners' basis in such certificates. In deciding whether or not a bona fide debtor-creditor relationship was created, the ultimate question which must be answered is "whether the advances constituted as a matter of practical reality (i.e., 'for tax purposes') an equity investment in the business of the corporation to which the advances were made, or a valid indebtedness within the meaning of the Internal Revenue Code." J. A. Maurer, Inc., 30 T.C. 1273, 1289, 1290. This question has been presented for decision to the courts on many occasions. The cases indicate that the relevant criteria to be considered in cases of this sort *197 are: "[the] name given to the certificates evidencing the indebtedness, the presence or absence of a maturity date, the source of the payments, the right to enforce the payment of principal and interest, participation in management, a status equal to or inferior to that of regular corporate creditors, the intent of the parties, capitalization, identity of interest between creditor and stockholder, and payment of interest only out of dividends." Wilbur Security Co., 31 T.C. 938, 948, affd. 279 F. 2d 657. Each case, however, must be decided on the basis of its own facts, and no one of the above criteria takes precedence over the others. See John Kelley Co. v. Commissioner, 326 U.S. 521; Gooding Amusement Co., 23 T.C. 408, affd. 236 F. 2d 159, certiorari denied 352 U.S. 1031; Emanuel H. (Manny) Kolkey, 27 T.C. 37, affd. 254 F.2d 51. The recent case of Sherwood Memorial Gardens, Inc. (Tennessee) 42 T.C. - (Apr. 17, 1964), presented the issue now before us on facts substantially similar to the facts in the instant cases. The certificates of indebtedness involved in that *198 case were in all material respects and language similar to the certificates of indebtedness issued by Gardens. We said, in that case, that petitioner's Certificates are not perfect debt instruments; they neither provide for the unconditional payment of any fixed sum to the holders thereof nor do they provide for the payment of any interest upon what is designated indebtedness. Moreover, there is no way of ascertaining from the Certificates of Indebtedness (or from the First Agreement which gave rise to their issuance) the principal amount of petitioner's purported obligation. To the extent that petitioner is obligated upon its Certificates of Indebtedness, it is obligated only for a percentage of its sales (assuming such sales occur), and in no event is it bound to repay the funds initially furnished to it. It is well settled that "the classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless *199 of the debtor's income or lack thereof." Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957). While some variation from this formula would not be fatal to petitioner's effort to have the advances of its Certificate holders treated as a debt for tax purposes, the substantial variation here involved, if not preclusive of such treatment, at least casts doubt upon the wisdom of its application. In the instant cases, as in the Sherwood case, there is no way of ascertaining the principal amount of Gardens' indebtedness from the face of the certificates of indebtedness or from the Gardens of Faith Agreement which gave rise to their issuance, and there is no provision for the payment of a fixed percentage in interest. Therefore, in the instant cases, as in the Sherwood case, the form of the certificates of indebtedness which lack the usual indicia of debt obligations supports the conclusion that no bona fide debtor-creditor relationship was established. Petitioners on brief have called our attention to the cases of Edward C. Myers, 6 T.C. 258; Roy J. Champayne, 26 T.C. 634; and Leonard Coplan, 28 T.C. 1189, as cases in which payments *200 made in uncertain amounts dependent on the use of property conveyed to the payors have been considered as payments for the property conveyed and have been taxed as capital gains. In those cases the question decided was whether or not sufficient rights to a patented invention had been coveyed as to effect a sale, rather than a license, of the invention to the payor. Those cases in no way considered the question which we are now discussing of whether the obligation to make the payments here involved did or did not have the usual indicia of a debt obligation - a question which is pertinent in considering the ultimate question, which was in no way involved in those cases, of whether the payments in question were made on account of an equity investment in the enterprise or were made on account of a fixed obligation of indebtedness. Another criterion pertinent to a consideration of this problem is whether the funds advanced to a corporation were placed at the risk of the enterprise or were repayable in any event. The rule has been stated to be: "[The] essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, *201 while the former seeks a definite obligation, payable in any event." Commissioner v. Meridian & Thirteenth R. Co., 132 F. 2d 182, 186; 2554-58 Creston Corp., 40 T.C. 932, 935; Gilbert v. Commissioner, 248 F.2d 399. In the instant cases it is clear that the purchasers of the "Certificates of Indebtedness" were taking "the risks of the venture." When negotiations were first entered into between the Cushings on the one hand and Murray and Mettee on the other hand, Murray and Mettee wanted a controlling stock interest in return for their investment. Cushing refused to give up stock control of the cemetery corporation because he wanted to build Gardens into one of the finest cemeteries in the East, and his experience in the Evergreen venture had convinced him that unless he had stock control of the cemetery there would be no assurance that funds would be set aside and utilized for the development and perpetual care of the cemetery. Accordingly, the use of certificates of indebtedness appealed to Cushing and in addition he was aware of the tax advantages incident thereto. The terms which were ultimately included in the certificates of indebtedness indicate that *202 at the time the transaction was consumated the parties were making an investment and taking the risks of the venture. In consideration for the conveyance of land to the corporation, the corporation had to pay 25 percent of the base sales price of all burial spaces sold for a period of 50 years. If the sales program was successful, the certificate holders could recover their investment and make a profit. Murray and Mettee realized that they could lose their investment if the sales program were unsuccessful. Thus the right to payment on the certificates of indebtedness for the land contributed to Gardens was tied to the financial success of the enterprise and, as such, the certificates represented an equity interest in the enterprise as opposed to a definite obligation payable in any event. See Sherwood Memorial Gardens, Inc. (Tennessee), supra; Aqualane Shores, Inc. v. Commissioner, 269 F. 2d 116, affirming 30 T.C. 519; Moughon v. Commissioner, 329 F. 2d 399, affirming a Memorandum Opinion of this Court. The fact that Murray and Mettee could, if a certain minimum sales volume was not maintained, dismiss Cushing as manager of Gardens and take *203 over the management themselves or appoint someone of their own choice as manager indicates that these men reserved unto themselves the not unusual remedy of preferred stockholders as opposed to creditors. See Kingsmill Corporation, 28 T.C. 330, 337. Another factor, and a very important one, which persuades us that the certificates of indebtedness issued by Gardens do not constitute bona fide evidences of indebtedness is the inadequacy of Gardens' capital. On May 23, 1957, Gardens issued only 71 shares of its Class A stock and 100 shares of Class B stock to Cushing in consideration for Cushing's promissory note in the amount of $13,550. Cushing made payments in satisfaction of the note in the amount of $1,000 on June 1, 1957, $6,550 on August 30, 1958, and $6,000 on May 23, 1959. Consequently, during its first year of operation Gardens had a paid-in capital of $1,000, and its total invested capital never exceeded $13,550. During the years here in issue Gardens paid approximately $355,000 with respect to its certificates of indebtedness. Gardens' principal asset, its land, cost its promoters approximately $173,500 to acquire. Approximately $25,000 was expended by Cushing *204 on behalf of Gardens for organization costs. Approximately $250,000 was spent by Gardens for development and improvement of its grounds. These figures show that Gardens' total paid-in capital of $1,000 during the first fiscal year of operation, $7,550 during the second fiscal year of operation, and $13,550 thereafter was wholly inadequate. This consistent with our finding that the parties intended to place their investment at the risk of the enterprise. See Sherwood Memorial Gardens, Inc. (Tennessee), supra, wherein the cemetery's capitalization of $1,000 was found to be "patently 'thin'" in view of a contribution, for which certificates of indebtedness were issued, of money and property in the amount of $60,000 by the stockholders in that case. See also Montclair, Inc. v. Commissioner, 318 F. 2d 38, affirming a Memorandum Opinion of this Court; Nassau Lens Co. v. Commissioner, 308 F. 2d 39, remanding 35 T.C. 268; Isidor Dobkin, 15 T.C. 31, affd. 192 F. 2d 392; Sam Schnitzer, 13 T.C. 43, affd. 183 F. 2d 70, certiorari denied 340 U.S. 911; Swoby Corporation, 9 T.C. 887. *205 In their argument to the effect that Gardens was not a corporation with an excessively "thin" capitalization with an unrealistic ratio of "debt" to capital, petitioners compare the formal capital of Gardens consisting of Cushing's note for $13,550 on which $1,000 was paid at the approximate time of Gardens' organization and the balance in the 2 succeeding years, with the cost to Cushing, Mettee, and Murray of the parcel of the Kenwood tract first conveyed to Gardens ($24,600), plus the amounts extended by Cushing for Gardens in the sum of $24,392.34, and argue that the resultant "ratio between borrowed and invested capital is less than 4 to 1, obviously not a thin corporation." In our opinion the pertinent ratio is the ratio between available invested capital of Gardens and its purported indebtedness. Obviously the latter factor is not the cost to the transferors of a parcel of land transferred to it, but the amount payable by Gardens on the "Certificates of Indebtedness" issued by Gardens as purported payment for the asset carried on its books as "Land and Land Contract." On the books of Gardens the item "Land and Land Contract" was shown as an asset and the item of "Certificates *206 of Indebtedness" was shown as a liability, both at "X," "X" representing an unknown quantity of dollars. The books carry the following explanation for the use of "X" rather than a dollar amount with regard to these items: Certificates of Indebtedness have been issued to acquire the 100 acre tract of land, in accordance with terms of agreement dated May 23, 1957. Inasmuch as the land purchase contract does not declare the monetary amount due, there is no calculation of cost possible until final maturity. Likewise, the final liability total is not calculable, except for sales of lots contracted for. While the use of "X," indicating an unknown quantity of dollars, may have been an acceptable bookkeeping practice with regard to these items in view of the general desire of accountants to achieve meticulous monetary accuracy, we are of the opinion that such a reasonably accurate approximation of the money value of "X" may be made as to supply the factor of "indebtedness" in a determination of the approximate ratio between the available formal invested capital and the purported indebtedness of Gardens for the purpose of considering the question of its alleged "thin" capitalization. The *207 symbol "X" used on Gardens' books to indicate the unknown monetary amount of its liability on the "Certificates of Indebtedness" represents 20 percent of the gross sales price of each grave lot multiplied by the number of such lots sold within 50 years. The record amply supports a conclusion that the 90,000 available cemetery lots would be sold within such period. During the 4 years, 1957 through 1960, approximately 20,000 lots were sold, and Cushing's guarantee to Murray and Mettee contemplated that at least 45,000 lots would be sold within 9 years. The initial price per lot was $87.50 but soon was increased to $100, and Cushing was of the opinion that the average price per lot sold would be $150. In order to compensate for any interest factor, we consider it proper to take the initial sales price per lot of $87.50 as the multiplicand of 90,000. Thus "X" as used in connection with the liability of Gardens on its "Certificates of Indebtedness" will be 20 percent of $87.50 multiplied by 90,000, or $1,575.000. Using this figure, the ratio of its purported debt to its paid-in capital is approximately 116 to 1. Even if we were to use the figure of $1,000,000 as represented by "X," as further *208 compensation for an interest factor, the ratio would be approximately 73 to 1. Either ratio indicates clearly that Gardens was a thinly capitalized corporation. The fact established by petitioners that it is generally difficult for cemetery corporations to obtain loans supports the conclusion that petitioners' capitalization was wholly inadequate. See 2554-58 Creston Corp., supra at 937. The only source for payments on the certificates of indebtedness was the base sales price of lots to be sold by Gardens, and hence from the earnings of the enterprise. The investors admitted that if the sales program was not successful a part of their investment might be lost. On the other hand, the amount of the payments with respect to the certificates of indebtedness would increase in direct proportion to the success of the sales program. These factors point to the conclusion that the certificates of indebtedness represented to the holders thereof a participation in the enterprise as owners as opposed to creditors. See Aqualane Shores, Inc. v. Commissioner, supra, and Sherwood Memorial Gardens, Inc. (Tennessee), supra. Cushing was advised by his accountant, De Wyn Gaert, and others *209 that Gardens would be entitled to deduct as the cost of land sold the payments made by it with respect to its certificates of indebtedness and thereby reduce its income tax liability. The certificate holders expected, pursuant to section 1232, to recover their bases in the certificates tax free and that all amounts received in excess of their bases would be taxable to them at capital gain rates. Cf. Howard Carleton Avery, 13 T.C. 351. Taxpayers are privileged, of course, to cast their transactions in such a fashion to minimize their tax liabilities, "[but] the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469; Knetsch v. United States, 364 U.S. 361, 365. What was done in the instant cases was a purported sale of land, costing its "vendors" approximately $173,500, to a corporation with an initial paid-in capital of $1,000. Although the entire tract was not initially conveyed to the corporation, the corporation was not under any obligation *210 to pay for the land transferred to it any fixed amount or at any fixed time. Even the expenditures by Cushing on behalf of Gardens in the amount of $24,392.34 for development, improvement, and organization expenses were not reflected in the capital accounts on Gardens' books or income tax returns, and Cushing took back certificates for this investment. These assets became permanent assets of the corporation and were essential to the conduct of its business. Such assets have been recognized to be a part of a corporation's permanent capital, placed at the risk of the business. Charter Wire, Inc. v. United States, 309 F. 2d 878, certiorari denied 372 U.S. 965; Sam Schnitzer, supra.The form in which the transaction was cast required Gardens to pay approximately 90 percent of the gross sales price of land for perpetual care, development, finance and insurance charges, salesmen's commissions, and to the certificate holders as "cost of the land." Therefore, 10 percent of the gross sales price remained for other expenses, such as taxes, advertising, equipment, maintenance, miscellaneous salaries, and profit. Gardens had income from services it performed *211 incidental to the sale of grave spaces. Although Gardens paid $130,970.45, $118,808.06, and $103,679.27 in the fiscal years ended May 31, 1958, 1959, and 1960, respectively, with respect to its certificates of indebtedness, it never paid any dividends with respect to its outstanding stock, and it reported losses for purposes of Federal income taxation in these fiscal years in the amounts of $20,553.24, $6,638.65, and $6,782.97, respectively. After certain adjustments agreed to in the stipulation by the parties Gardens had earnings in these years in the respective amounts of $1,167.60, $2,675.36, and $14,780.94. The fact that it is likely that all grave spaces will be sold within 50 years from the date of commencement of sales, a period of time equal to the term of the certificates of indebtedness, indicates that the parties intended the certificate holders to take substantially all, if not all, gain from the sale of grave spaces. Although Cushing was more interested in obtaining the necessary capital for the venture than in the tax consequences of the "Certificates of Indebtedness" issued by the corporation to those who furnished such capital, he was thoroughly aware of the supposed *212 favorable tax consequences to the corporation and to holders of such certificates. These tax consequences did constitute a material motive of Murray and Mettee in arranging with Cushing for the issuance to them of these certificates. These facts support the conclusion that a tax avoidance purpose motivated the form in which the transaction was cast, Sherwood Memorial Gardens, Inc. (Tennessee), supra; Foresun, Inc., 41 T.C. 706, on appeal (C.A. 6, Apr. 20, 1964), and that the purported indebtedness lacks "substantial economic reality." Nassau Lens Co. v. Commissioner, supra.
On the basis of the foregoing and on the authority of our recent decision in Sherwood Memorial Gardens, Inc. (Tennessee), supra, it is our conclusion that the certificates of indebtedness were neither in form nor substance bona fide evidences of indebtedness. Therefore, respondent properly disallowed as deductions to Gardens payments made with respect to such certificates as the cost of land sold, and respondent properly included such payments in Cushing's and Kathryne's gross income as dividends received. See Isidore Himmel, 41 T.C. 62, 73, on appeal (C.A. 2, Jan. 6, 1964; *213 Moughon v. Commissioner, supra.
It is argued on behalf of the Cushings that they are entitled to recover the cost of the certificates of indebtedness to them before the payments received constitute taxable income. Our decision to treat the property transferred to Gardens by Cushing, Murray, and Mettee as equity capital disposes of this argument. The contributions by Cushing to Gardens, for which he was given the certificates of indebtedness and which we have found to be capital contributions for purposes of taxation, increase the cost of his stock by the amount of his contributions, and the determination of his capital gain or loss on the entire investment will take place upon the ultimate disposition of the stock. [6]Isidore Dobkin, supra; Harry Sackstein, 14 T.C. 566; Edward G. Janeway, 2 T.C. 197, affd. 147 F. 2d 602. The fact that some of the certificate *214 holders are not also stockholders does not change the result that the property transferred to Gardens constituted equity capital. Sherwood Memorial Gardens, Inc. (Tennessee), supra; Foresun, Inc., supra.[7]
Petitioners argue that the purchase of land by the issuance of certificates of indebtedness has become common in the cemetery business, and that, in the instant cases, valid certificates of indebtedness were issued so that the payments made with respect to such certificates should be treated as the cost of land sold by Gardens, and as a return of capital and amounts received in exchange for such certificates by the holders thereof. Petitioners rely on American Exch. Nat. Bank v. Woodlawn Cemetery, 194 N. Y. 116, 87 N.E. 107; Gregory v. Chapman, 119 Md. 495, 87 Atl. 523; Kensico Cemetery, 35 B.T.A. 498, affd. 96 F. 2d 594; and Howard Carleton Avery, supra. All of these cases were *215 relied on by the petitioners and found to be distinguishable in Sherwood Memorial Gardens, Inc. (Tennessee), supra. Inasmuch as the facts and conclusions reached in Sherwood and in the instant cases are substantially the same, the cases relied on by petitioners herein are also distinguishable from the facts of the instant cases for the reasons given in Sherwood. Petitioners also make an argument, which may be characterized as an argument ad hominem, to the effect that since under Maryland law Gardens could be required by its certificate holders (in particular Murray and Mettee) to pay to them 20 percent of the corporation's sales pursuant to the terms of the certificates regardless of any profit of the corporation, see Gregory v. Chapman, supra, and if respondent's determination is sustained and Gardens also is required to pay the deficiencies in tax plus interest thereon for the years in issue and for succeeding years, Gardens would become hopelessly insolvent, and that Cushing who had guaranteed Gardens' time sales contracts which were hypothecated with a bank, would also be rendered insolvent. We point out that these unfortunate eventualities, if they occur, would *216 be the results of the arrangements entered into by petitioners themselves and suggest that another argument ad hominem might be made that it would be unfortunate, if petitioners' position in these cases were sustained, that Gardens would be allowed deductions aggregating over $1,000,000 as "cost of land sold," which cost its promoters approximately $173,000 to acquire, and to treat the payments of over $1,000,000 to the promoters on account of the "Certificates of Indebtedness" as capital gain when we have concluded that they intended to take "the risks of the venture" by investing their capital in the venture, and where no bona fide debtor-creditor relationship was created. The issue, contentions of the parties, and many of the facts in Docket No. 1363-62, with respect to the certificates of indebtedness issued by Evergreen, are substantially the same as those relating to the certificates of indebtedness issued by Gardens. However, since Evergreen is not a party to these proceedings, it is not necessary for us to decide whether the payments may with respect to the certificates are deduct[*] by the cemetery as the cost of land sold. Turning first to the form of the certificates *217 issued by Evergreen, we find them to be in all material respects similar to those issued by Gardens. It is equally apparent in the case of Evergreen that the certificate holders never intended to be creditors of Evergreen, but placed their investments at the risk of the enterprise. The terms of the certificates issued by Evergreen, as the terms of those issued by Gardens, provided that the cemetery would pay to the holders of the certificates a certain percentage of the base sales price of all burial spaces sold in the cemetery. If the sales program was successful, the certificate holders could recover their investment and make a profit, but, if unsuccessful, there was no provision for payment of interest or repayment of capital. It is significant that the Evergreen Memorial Gardens Agreement provided for the sharing of the profits and losses of the enterprise by the participants in the venture according to certain specified percentages, and that the "Certificates of Indebtedness" of Evergreen were issued to the participants according to these same percentages, while the formal capital stock of Evergreen was not. It appears that the profits of the enterprise were reserved to the certificate *218 holders by that part of the agreement which provided that all of Evergreen's stock was to be placed in escrow until such time as Evergreen completed its payments on the certificates. All of these circumstances indicate that the certificates represented an equity interest in the enterprise as opposed to a definite obligation payable in any event. Assuming that Evergreen received money or property for the 300 shares of $10 par value stock it issued, Evergreen's paid-in capital was $3,000. [8]Evergreen paid $10,298.35, $15,314.25, and $12,535.82, with respect to its certificates of indebtedness in the years 1957, 1958, and 1959, respectively. Similar payments were called for during the succeeding 21 years. The record with regard to the operation of Evergreen is not as detailed as with regard to Gardens. However, after a careful consideration of the evidence specifically relating to Evergreen and that part of the evidence relating to Gardens which in our opinion fairly applies to Evergreen also, it appears to our satisfaction that the total amount of the socalled "indebtedness" represented by the certificates issued by Evergreen may be approximated in the minimum amount of $180,000 for *219 the purpose of estimating a of debt to equity. Thus we may [*] servatively estimate the ratio of [*] "debt" to formal capital to be 60 to 1, [*] which clearly indicates that Evergreen as a thinly capitalized corporation. Everg[*] principal asset, its land, cost its [*] approximately $30,000 to acqurie. A [*] mortgage was obtained to finance the [*] of the land, and payments to the [*] holders were subordinated to debt. Evergreen also borrowed $2,00[*] [*$ Cushing "for use as capital surplus." [*] the time of its organization through Evergreen spent approximately [*] on improvement and development [*] factors support the conclusion, These that Evergreen was a thinly caponly corporation but also that its capital wed adequate and that the certificates [*] in exchange for the land transferred to corporation were in effect evidences of an investor's equity in the enterprise. We are satisfied from the record before us that tax avoidance constituted a material and controlling motive in causing the *220 participants in the Evergreen venture to choose the form in which the transaction was cast with particular reference to the issuance of the "Certificates of Indebtedness." The transaction was not one of "substantial economic reality." For the reasons given in our discussion with respect to the Gardens venture, we hold that respondent did not err in determining that the amounts received by Cushing and his wife Kathryne in each of the years in issue with respect to certificates of indebtedness issued by Evergreen constituted dividends taxable at ordinary income rates. The last remaining issue presented for our decision is whether certain cemetery lots sold by Cushing in 1957 to Belair were held by him primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 1221(1). [9] Petitioner contends that he is entitled to treat his gain on the sale as capital gain because he was not in the business of holding cemetery lots for sale to customers, and because he did not own nor sell any other cemetery lots other than those in issue. In opposition respondent argues that the gain from the sale of the lots in issue constitutes ordinary income *221 to Cushing because the lots in question did not represent capital assets in his hands for the reason that Cushing held the lots with the intention that they would be reacquired by Belair, a cemetery corporation owned by Cushing and his wife, for sale to customers. It is respondent's position that the lots in question were sold by Belair as Cushing's agent. The issue presented is, of course, factual. Although this issue has been presented to this Court and others on many occasions, each case must be decided on its own facts. The courts in passing on this issue, however, have pointed out the factors *222 to be considered in determining whether property at the time of sale was held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. These include "the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising." W. T. Thrift, Sr., 15 T.C. 366, 369. See also Pennroad Corp. v. Commissioner, 261 F. 2d 325, affirming 29 T.C. 914, certiorari denied 359 U.S. 958; Ralph J. Oace, 39 T.C. 743. No one of the above factors is necessarily decisive of the issue. See Tidwell v. Commissioner, 298 F. 2d 864, affirming a Memorandum Opinion of this Court; Kaltreider v. Commissioner, 255 F. 2d 833, affirming 28 T.C. 121. The facts in the instant cases are that Cushing acquired the lots in question from Belair in 1950 and 1953 in lieu of salary due *223 to him from the corporation which it could not afford to pay. Cushing resold these lots in bulk to Belair in May 1957 in order to raise capital for his participation in the Gardens venture. Respondent has not determined and has made no argument that the gain on the sale in the amount of $12,100 was unreasonable or excessive. Although Cushing has been in the cemetery business for approximately 25 years, and although he was employed prior to 1945 by various cemetery companies as a salesman of cemetery lots, he never owned nor sold cemetery lots as an individual with the exception of those lots here in issue. On the basis of these facts, we conclude that Cushing did not hold the lots in question primarily for sale to customers in the ordinary course of his trade or business. In Walter H. Kaltreider, supra; August Engasser, 28 T.C. 1173; and Burgher v. Campbell, 244 F. 2d 863, which are relied on by respondent, it was found that the petitioners were engaged in the trade or business of holding real estate for sale to customers in the ordinary course of their business. They transferred all or part of their land to corporations controlled by them *224 to continue that business. It was held that the gain on the sale of the land to the corporations involved, or the amounts received by the petitioners from the corporations which sold the land, was taxable at ordinary income rates for the reason that the petitioners were merely carrying on their business through agents. In Raymond Bauschard, 31 T.C. 910, affd. 279 F. 2d 115, upon which respondent also relies, the taxpayer and others bought land to develop and sell to customers in the ordinary course of their business. A corporation was utilized to own and develop the land. Proceeds of sale were paid by the corporation to a trust which made distributions to the taxpayer. It was held on the authority of the Kaltreider case that the gain on the sale of the real estate constituted ordinary income to the trust and to the taxpayer for the reason that their agents, the corporation and the taxpayer's coadventurer, were engaged in the trade or business of selling real estate in the ordinary course of their business. These cases are distinguishable on their facts from the instant cases. Cushing was not engaged in the trade or business of holding cemetery lots for *225 sale to customers in the ordinary course of his trade or business. Therefore, the sale of such lots to customers by Belair, if made, would not be done as Cushing's agent, and the gain from such sales would not constitute ordinary income to Cushing. Cushing's gain on the sale of the lots in question to Belair was taxable to him at capital gain rates. See Ralph E. Gordy, 36 T.C. 855, wherein it was held that isolated sales of real estate to corporations engaged in the business of real estate development, in which corporations the taxpayer was the president and majority stockholder, did not constitute ordinary income to the taxpayer for the reason that there was no jurisdiction for ignoring the corporate entities and for imputing the real estate activities of the corporations to the individual taxpayer. Similarly, in the instant cases, where there was an isolated sale of cemetery lots to a corporation owned and managed by the taxpayer, there is no justification for disregarding Belair as a corporate entity and for imputing Belair's business of selling cemetery lots to Cushing. We decide this issue for petitioner Cushing. Decisions will be entered under Rule 50. Footnotes
1. Unless otherwise designated, all references to Code sections refer to the Internal Revenue Code of 1954.↩
1. No explanation is given for the discrepancy between this entry and the stipulation that the stock was issued on December 19, 1955.↩
2. The balance shown on the memorandum of settlement as payable by the purchasers was $149,758.93. This was computed on the basis of a purchase price of $173,500 and by allowing as "Amount Paid on Account" the sum of $25,000. Other expenses and taxes payable by the purchasers totaled $2,305.27, of which $523.17 was also deducted from the purchase price. There is no breakdown as to the dates of the payments reflected by the item "Amount Paid on Account" in the sum of $25,000. The record does not explain the discrepancy between this sum and the total of advances to the Sewards specifically found by us to have been made in the total amount of $21,000. We assume that an additional $4,000 was paid on account prior to November 19, 1956.↩
3. The method used by respondent in computing these amounts allowed as deductions for the cost of land sold is not spelled out in the record before us. However, petitioners make no argument that they would be entitled to greater deductions than allowed should this issue be decided in favor of respondent.↩
4. The amount of such earnings and profits of Gardens during the years in issue may be determined under Rule 50. ↩
5. SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS. (a) General Rule. - For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof - (1) Retirement. - Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954). * * *↩
6. Of course, the basis of the stock will be decreased on account of the distributions, if any, which are not dividends within the meaning of sections 301 and 316 of the Internal Revenue Code of 1954↩. See also footnote 4, supra.
7. What allowances, if any, these individuals are entitled to with respect to recovery of their cost basis in their certificates of indebtedness is a question not before us and one upon which we express no opinion.↩
8. As we have indicated in our Findings, the record is unsatisfactory as to when this stock was issued, the amount paid in for, and the dates of such payments.↩
9. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩