William S. Peterson and Betty M. Peterson v. Commissioner.
Peterson v. Commissioner
Docket No. 92713.
United States Tax Court
T.C. Memo 1965-108; 1965 Tax Ct. Memo LEXIS 222; 24 T.C.M. (CCH) 574; T.C.M. (RIA) 65108; April 21, 1965
Dale Forbes and Melvyn M. Ryan, for the petitioners. H. Kent Holman, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in petitioners' income tax as follows: Taxable Year
Amount
1956
$3,960.95
1957
4,225.45
1958
2,443.99
1959
1,995.10 The parties have reached agreement as to the disposition of all issues except one. The remaining issue for decision is whether distributions received by petitioners during the years in issue with respect to instruments issued by a cemetery *223 corporation and designated "Registered Certificates of Indebtedness" constitute distributions received upon the exchange for the partial redemption or retirement of said certificates, thereby rendering the gains taxable at capital gain rates pursuant to section 1232 of the Internal Revenue Code of 1954[1] or constitute dividend income taxable as ordinary income. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners William S. Peterson (hereinafter sometimes referred to as Peterson) and Betty M. Peterson (hereinafter sometimes referred to as Betty) are husband and wife residing in Kalispell, Montana. They filed their joint Federal income tax returns for the years in issue with the district director of internal revenue, Helena, Montana. Peterson has been associated with cemetery corporations since 1951, serving in the capacity of assistant sales manager as well as sales manager. He worked in different cities in North Dakota, *224 as well as in Billings, Montana, prior to his moving to Kalispell, Montana. While working as sales manager for a cemetery in Billings, Peterson decided to purchase land in Kalispell suitable for use as a cemetery. It was Peterson's intention to purchase the land in his own name and then transfer it to a corporation which he would create for the purpose of operating a cemetery. During his association with the cemetery business he became acquainted with an attorney who was associated with a cemetery in Kansas City, Missouri. Peterson learned from this attorney the use of certificates of indebtedness in connection with the transfer of land to a cemetery corporation. The attorney passed this information on to Peterson's accountant and aided Peterson in the preparation of the certificates for use in the corporation which Peterson created in Kalispell. On January 12, 1955, Peterson and Betty purchased a 10-acre piece of land in Kalispell for the sum of $2,500. During the time they held this property they did not in any way improve the property. Glacier Memorial Gardens of Kalispell, Inc., (hereinafter referred to as the corporation) is a Montana corporation which was organized on or *225 about the 24th day of January 1955 with its principal place of business located at Kalispell, Montana. The business of the corporation was to acquire and operate the land to be used exclusively for a cemetery for the burial of the dead and to conduct activities necessary and incidental to the operation of such cemetery. Since its organization, the corporation has been engaged in the business of operating a memorial-type cemetery, known as Glacier Memorial Gardens, at Kalispell, and a part of such business has included the sale to the public of burial rights in lots and plots located therein. The corporation was formed under the Montana laws applicable to commercial and profitable corporations. The amount of the capital stock was 5,000 shares with a par value of $10 each. At all times pertinent hereto Peterson and Betty owned all of the outstanding capital stock of the corporation. The total amount paid in for the stock at all times pertinent hereto by Peterson and Betty $60was. Peterson was president of the corporation as well as sales manager from the date of incorporation up to and including all the years in issue. Peterson, Betty, and Dean Beller were the members of the board *226 of trustees of the corporation. They were elected as such at the first meeting of the stockholders of the corporation held on February 18, 1955. On the same day the board of trustees held their first meeting and elected Peterson president of said corporation. On February 11, 1955, petitioners transferred the land they had acquired on January 12, 1955, to the corporation by warranty deed. The total consideration was noted on the deed as less than $100. The purchase and subsequent transfer by the petitioners of the above-described real estate to the corporation were and are the only purchase and sale of real estate made by the petitioners, save and except the purchase of a personal residence used by petitioners as such. On the same date and in consideration for the warranty deed, the parties entered into a Land Purchase and Financing Agreement. The pertinent parts of the agreement are as follows: * * *
WHEREAS, FIRST PARTY [Peterson] has acquired a tract of land consisting of approximately 10 acres in the County of Flathead, near the City of Kalispell, Montana, which said tract is particularly described in Exhibit "A" attached hereto and made a part hereof by reference, *227 and WHEREAS, said tract of land is suitable for use as a cemetery property for burial of the dead and SECOND PARTY [the corporation] desires to acquire from FIRST PARTY said tract of land and his right, title and interest therein and SECOND PARTY desires to dedicate said property for cemetery purposes and operate a cemetery thereon and make sales of lots and grave spaces and burial rights therein, and WHEREAS, FIRST PARTY is willing to transfer and assign his right, title and interest in said land and to accept in consideration therefor the covenants and agreements and promises and obligations of SECOND PARTY all as hereinafter set out, NOW, THEREFORE, It is Agreed as Follows: 1. FIRST PARTY does hereby assign, set over, and convey to SECOND PARTY, all of his right, title and interest in and to the land particularly described in Exhibit "A" attached hereto, and agrees to execute and cause the execution of proper and necessary documents of conveyance so that SECOND PARTY will be vested with title thereto. II. As consideration for said transfer of said land, SECOND PARTY hereby agrees to pay to FIRST PARTY, his heirs and assigns, a sum equal to Twenty (20%) per cent of the *228 gross sale price (as hereinafter defined) of each and every lot, grave space and/or burial right sold by SECOND PARTY, its successors or assigns, from the said property which is the subject of this agreement and which is described in Exhibit "A" attached hereto, and any further additions made thereto, beginning with the date when SECOND PARTY makes the first sale therefrom and continuing until all the lots, grave spaces and burial rights contained in said land, and any additions thereto, are sold. Said percentage of sales shall be due and payable to FIRST PARTY, his heirs, assignees and transferees, Upon sales made for cash, immediately. Upon sales made on the installment payment plan FIRST PARTY shall be paid Forty (40%) per cent of each installment payment collected and received by SECOND PARTY from each individual respective lot, grave space and/or burial right purchaser after said purchasers have paid Fifty (50%) per cent of their respective total purchase price, until FIRST PARTY has received in full the amount due him hereunder from each such sale. III. In addition to the sums agreed to be paid to FIRST PARTY in paragraph numbered "II" hereinabove, SECOND PARTY further *229 agrees to pay to FIRST PARTY, his heirs, assigns and transferees, a sum equal to Ten (10%) per cent of the gross sale price (as hereinafter defined) of family memorials and individual grave markers, and any items of merchandise, sold in connection with said property, for and during the time when lots, grave spaces and/or burial rights are being sold from said property. Said percentage of sales of memorials and markers sold shall be due and payable to FIRST PARTY Upon sales made for cash, immediately, and Upon sales of said items made on the installment payment plan FIRST PARTY shall be paid Twenty (20%) per cent of each installment payment collected and received by SECOND PARTY from each individual respective purchaser of said items after said purchasers have paid Fifty (50%) per cent of their respective total purchase price, until FIRST PARTY has received in full the amount due him hereunder from each said sale. IV. The "gross sale price" of lots and burial spaces and burial rights on which said percentages of sales provided for herein is to be computed, shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual respective *230 lot or grave or burial right purchaser less the sum agreed to be deposited from each sale for perpetual care and maintenance purposes, and also less any service or carrying charge, and also less the actual cost to SECOND PARTY of any insurance premiums, bonuses, et cetera, agreed by SECOND PARTY to be provided to the purchaser in addition to the lot or grave space or burial right, which premiums, bonuses, et cetera, are used to induce sales. The "gross sale price" of memorials and markers on which the percentage of sales of such items is to be computed, shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual respective purchaser, less any sum agreed to be deposited from each such sale for perpetual care and maintenance purposes, also less any service or carrying charge, and also less the actual cost to SECOND PARTY of any insurance premiums, bonuses, et cetera, agreed by SECOND PARTY to be provided to the purchaser in addition to the memorial or grave marker, which premiums, bonuses, et cetera, are used to induce sales. V. The parties hereto agree that the percentages of sales required hereby to be paid to FIRST PARTY, and *231 the right to receive the same, as set out in paragraphs numbered "II" and "III" hereof, shall be divided into One Hundred (100) equal parts and SECOND PARTY agrees to issue to and deliver to FIRST PARTY registered Certificates of Indebtedness representing such parts, in the denomination as may be requested by FIRST PARTY and the said Certificates of Indebtedness shall be personal property and shall be transferable by the FIRST PARTY, or any registered holder thereof, or their representatives or asigns, only upon the books of the SECOND PARTY upon the surrender of said Certificates of Indebtedness of which such transfer is desired. Each Certificate of Indebtedness, and the registered holder thereof, shall be entitled to the pro rata share of the percentage of sales provided to be paid in paragraphs numbered "II" and "III" herein that the units of interest of each Certificate bears to the total of One Hundred (100) equal parts or units. Each said Certificate of Indebtedness shall be in form and content as shown by a copy attached to this agreement marked Exhibit "B". * * *
Pursuant to said agreement, the corporation issued on the same date "Registerd Certificates of Indebtedness" *232 to Peterson. The pertinent parts of said certificates read as follows: This is to certify that William S. Peterson is entitled to an interest equal to Fifty One Hundredths (50/100ths) in Twenty (20%) per cent of the proceeds represented by the sale of all lots and grave spaces, and also in Ten (10%) per cent of the proceeds represented by the sale price of family memorials, grave markers, and any items of merchandise, sold by the undersigned, in, from, and in connection with Glacier Memorial Gardens of Kalispell, a cemetery situate in Flathead County, Montana, during the period of time beginning with the date when the undersigned first makes a sale from and in connection with said property, and continuing thereafter until all the lots, grave spaces and burial rights contained in said land, and any additions thereto, are sold, all as set forth and in accordance with an agreement between William S. Peterson, on the one part, and Glacier Memorial Gardens of Kalispell, Inc., on the other part, dated the 11th day of February, 1955, which said agreement is incorporated herein by reference. Such proceeds from said sales shall constitute the original land purchase and financing fund of Glacier *233 Memorial Gardens of Kalispell, Inc., and shall be accumulated only out of the last Fifty (50) per cent of the sale price to the undersigned on each burial space on account of each such sale. Glacier Memorial Gardens of Kalispell, Inc., shall be liable to the holder of this Certificate, and this Certificate shall be a lien on such original land purchase and financing fund, to the extent of the interest represented by this Certificate; and the holder of this Certificate shall be entitled to have paid over to him such proportions of said fund as the number of units represented by this Certificate bears to the total number of One Hundred (100) units. Payments on account of this Certificate of Indebtedness shall after April 1st, 1955, be made on the first day of each month in each year, and shall continue only for such period of time as is necessary to pay out in full the amount accumulated in the original land purchase and financing fund. After all such payments are made, the liability of Glacier Memorial Gardens of Kalispell, Inc., under this Certificate of Indebtedness shall terminate and the obligation represented by this Certificate shall be discharged, and this Certificate shall *234 be surrendered for cancellation. This Certificate is transferable only on the books of Glacier Memorial Gardens of Kalispell, Inc., by the original holder thereof in person or by his attorney, on surrender of this Certificate. * * *
The acceptance of the deed to the above-described real property by the corporation and the execution of the documents entitled "Land Purchase and Financing Agreement" and "Registered Certificates of Indebtedness" were approved by corporate minutes. Pursuant to the land agreement and the certificates of indebtedness, the return Peterson would receive bore a direct relationship to the financial success of the business. Improvement to the property had to be made, including the building of roads, walkways and memorials and the planting of shrubbery. The cost of these improvements was financed out of current sales of cemetery lots. The corporation sold grave spaces, memorials, markers, and other merchandise during the years 1956, 1957, 1958, and 1959. Under the terms of the Land Purchase and Financing Agreement and documents entitled "Registered Certificates of Indebtedness" Peterson received $13,038.90, $16,941.15, $12,059.74, and $8,074.36 in the *235 years 1956, 1957, 1958, and 1959, respectively. In every case all payments in issue for the years 1956, 1957, 1958, and 1959 were made not less than six months after the documents entitled "Registered Certificates of Indebtedness" were issued. The payments made by the corporation on the certificates of indebtedness were treated as a cost of land purchased, and as such were deducted as a cost of sales by the corporation in arriving at its gross profit. The foregoing payments were reported by petitioners on their returns for the years in issue as long-term capital gain. The corporation has never paid nor declared any formal cash dividends during the years 1955 through and including 1959. All documents were drawn and all documents entitled "Registered Certificates of Indebtedness" were drawn and issued by the corporation for the purpose of meeting the requirements of section 117(f) of the Internal Revenue Code of 1939, reenacted as section 1232 of the Internal Revenue Code of 1954. In his deficiency notice respondent determined that the amounts received by Peterson as the owner of the certificates of indebtedness constituted ordinary income. Opinion *236 Petitioners contend that the payments received with respect to their certificates of indebtedness is taxable as long-term capital gain under the provisions of section 1232. [2] Petitioners argue that there was a bona fide sale of land to the corporation here involved; that in consideration for the land, petitioners received registered certificates of indebtedness which did not have a determinable fair market value at the date of issue; and that a debtor-creditor relationship was created so that the payment received by them on their certificates is applied first against their basis, and any excess payment over the basis represents capital gain. Respondent, *237 on the other hand, takes the position that the conveyance of the land and the issuance of the certificates of indebtedness were part of a nontaxable transaction covered by the provisions of section 351. [3] Respondent maintains that a bona fide debtor-creditor relationship never was intended to be created nor was one in fact created, that the certificates of indebtedness are in reality equity instruments, and that the payments received by petitioners during the years in issue represent dividends. Respondent points to the instruments themselves as a clear indication that they are not "debt instruments" in that they neither provide for the unconditional payment of any fixed sum nor do they provide for interest. We agree with respondent. *238 The question we have to decide is whether or not the certificates of indebtedness received by petitioners on the transfer of land to the corporation constitute for tax purposes valid debt instruments. This very issue has been recently decided by this Court on facts almost identical with those herein. In Sherwood Memorial Gardens, Inc., 42 T.C. 211 (1964), on appeal (C.A. 7, Aug. 10, 1964), and Gardens of Faith, Inc., T.C. Memo. 1964-178, affd. 345 F. 2d 180 (C.A. 4, 1965), [4] this Court found the certificates of indebtedness used therein were not true debt instruments but were instruments evidencing a proprietary equity interest in the nature of preferred stock. Nothing further could be accomplished by our restating the reasons for reaching such a conclusion. The petitioners herein have advanced no new arguments or theories which have not already been discussed and rejected by this Court in Sherwood Memorial Gardens, Inc., and Gardens of Faith, Inc., both supra. Accordingly, on the authority of Gardens of Faith, Inc., and Sherwood Memorial Gardens, Inc., we conclude that the certificates of indebtedness were neither in form nor in substance *239 true debt instruments; that a debtor-creditor relationship was never intended to be established; and, thus, the payments made by the corporation here involved during the years in issue are properly to be included in full in the gross income of petitioners as dividends received to the extent of the corporation's earnings and profits. [5]
Decision will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.↩
2. SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS. (a) General Rule. - For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof - (1) Retirement. - Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor * * *↩
3. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.↩
4. For a more recent opinion see Harold Roe, T.C. Memo. 1965-100↩. 5. The computation of the earnings and profits of the corporation here involved can be accomplished under Rule 50.↩