Donald J. Peterson and Ruth M. Peterson v. Commissioner.
Peterson v. Commissioner
Docket No. 2247-63.
United States Tax Court
T.C. Memo 1965-151; 1965 Tax Ct. Memo LEXIS 180; 24 T.C.M. (CCH) 798; T.C.M. (RIA) 65151; June 1, 1965
*180 Dale Forbes and Melvyn M. Ryan, for the petitioners. H. Kent Holman, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in petitioners' income taxes as follows: Taxable
Petitioner
Year
Amount
Donald J. Peterson [1]
1957
$1,861.94
Donald J. Peterson and Ruth
M. Peterson
1958
1,623.25
Donald J. Peterson and Ruth
M. Peterson
1959
959.10
The issue for decision is whether distributions received by petitioners during the years in issue with respect to instruments issued by certain cemetery corporations and designated "Certificates of Indebtedness" constitute distributions received upon the exchange for the partial redemption or retirement of said certificates, thereby rendering the gains taxable at capital gain rates pursuant to section 1232 of the Internal Revenue Code of 1954, [2] or constitute dividend income taxable as ordinary income. The other issue *181 raised by the pleadings has been settled by the parties and will be given effect to under the Rule 50 computation. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners Donald J. Peterson (hereinafter sometimes referred to as Peterson) and Ruth M. Peterson (sometimes hereinafter referred to as Ruth) are husband and wife residing in Portland, Oregon. The income tax returns for the years in issue were filed with the district director of internal revenue, Helena, Montana. The return for 1957 was the separate return of Peterson, while the returns for 1958 and 1959 were joint returns of Peterson and Ruth. Peterson became associated with the cemetery business in 1952, starting as a salesman. He was employed by Sunset Memorial Gardens of Billings, Inc. (hereinafter referred to as Billings), a corporation whose principal place of business was in Billings, Montana. He was employed by Billings until 1958 when he left for Kalispell, Montana, and became associated *182 with Glacier Memorial Gardens of Kalispell, Inc., another cemetery corporation, operating in Kalispell, in which corporation Peterson served as salesman. During his tour of duty with Billings, Peterson rose to the position of vice-president and sales manager. In his capacity of sales manager he supervised salesmen connected with the following Montana cemetery corporations: Sunset Memorial Gardens of Lewistown, Inc., Sunset Memorial Gardens of Sidney, Inc., Sunset Memorial Gardens of Harve, Inc., and Sunset Memorial Gardens of Shelby, Inc.; also Sunset Memorial Gardens of Bend, Inc., located in Bend, Oregon. Hereinafter each cemetery corporation will be referred to by the city wherein it is located. The following is a list of the corporations involved herein, showing the date of incorporation and the shares of stock owned by Peterson: Shares
Date of
Owned by
Corporation
Incorporation
Peterson [1]
Billings
November 3, 1952
1
Sidney
July 22, 1955
None
Lewistown
June 17, 1955
50
Havre
January 21, 1955
None
The business of each of the corporations *183 referred to in the above schedule was to acquire and operate land to be used exclusively for a cemetery for the burial of the dead and to conduct activities necessary and incidental to the operation of such cemetery. Since their organization the corporations have been engaged in the business of operating memorial-type cemeteries and a part of such business has included the sale to the public of burial rights in lots and plots located therein. During his employment at Billings, Peterson, together with Edwin Rath (hereinafter referred to as Rath), the president of Billings, purchased various pieces of real property suitable for cemetery purposes which they in turn transferred to the corporations herein involved. On February 18, 1955, Peterson and Rath purchased for $2,500 each a parcel of land located near Billings, Montana. During the time that Peterson and Rath held this property they did not in any way improve it. On February 28, 1955, Peterson and Rath transferred the land they had acquired on February 18, 1955, to Billings by warranty deed. The total consideration was noted on the deed as less than $100. On the same date and in consideration for the warranty deed, the parties *184 entered into a Land Purchase Agreement. The pertinent parts of the agreement are as follows: WHEREAS, SECOND PARTY has for some time been the owner of and operating a cemetery property called Sunset Memorial Gardens located in Yellowstone County, Montana, near the City of Billings, and whereas, said company is in need of and can use to its advantage an additional tract of acreage adjoining its original property and has made arrangements with FIRST PARTIES [Rath and Peterson] for the acquisition thereof, under the terms and conditions and for the payments of money hereinafter specifically set out, and WHEREAS, FIRST PARTIES are now the owners of said tract of land and are willing to transfer and assign their right, title and interest in said land to SECOND PARTY [Billings] and accept in consideration therefor the covenants and agreements and promises and obligations of SECOND PARTY, all as hereinafter set out, said tract of land being described as shown in Exhibit "A" attached hereto and made a part hereof by reference. NOW, THEREFORE, It is Agreed as Follows: 1. FIRST PARTIES do hereby assign, set over, convey, and transfer to SECOND PARTY all of their right, title and *185 interest in and to the tract of land described in Exhibit "A" hereto attached and do agree to execute and deliver to SECOND PARTY a Warranty Deed making effective said transfer. It is agreed that said tract of land shall be dedicated for cemetery purposes and shall be added to and become a part of the original tract now owned and operated as a cemetery property and known as Sunset Memorial Gardens, and that in addition to the dedication of said property for such purposes the said tract shall be developed as cemetery property in accordance and along the general plan of the said cemetery proper. 2. As consideration of said transfer of said land SECOND PARTY hereby agrees to pay to FIRST PARTIES, their heirs and assigns, a sum equal to Ten (10%) per cent of the gross sale price (as hereinafter defined) of each and every lot, grave space, and/or burial right sold by SECOND PARTY, its successors or assigns, from the said property which is the subject of this agreement and which is described in Exhibit "A" attached hereto, and also from the original tract of land which has heretofore made up the said cemetery property and described in Exhibit "B" attached hereto, and also a sum equal to *186 Ten (10%) per cent of the sale price of family memorials, grave markers, and any items of merchandise sold by SECOND PARTY in, from, and in connection with the operation of said cemetery property and all of it by SECOND PARTY, its successors or assigns, beginning with sales on the date of this agreement and continuing until all the lots, grave spaces, and burial rights contained in said land, and any additions thereto, are sold. Said percentages of sales shall be due and payable to FIRST PARTIES, their heirs, assignees, or transferees, Upon sales made for cash, immediately, and Upon sales made on the installment payment plan FIRST PARTIES shall be paid Twenty (20%) per cent of each installment payment collected and received by SECOND PARTY from each individual respective lot, grave space, and/or burial right, family memorial, grave marker, or merchandise purchaser, after said purchasers have paid Fifty (50%) per cent of their respective total purchase price, until FIRST PARTIES have received the full amount due them hereunder from each such sale. 3. The "gross sale price" of lots and burial spaces and burial rights on which said percentages of sales provided for herein is *187 to be computed shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual, respective lot or grave or burial right purchaser less the sum agreed to be deposited from each sale for perpetual care and maintenance purposes, and also less any service or carrying charge, and also less the actual cost to SECOND PARTY of any insurance premiums, bonuses, et cetera, agreed by SECOND PARTY to be provided to the purchaser in addition to the lot or grave space or burial right, which premiums, bonuses, et cetera, are used to induce sales. The "gross sale price" of memorials, markers, or any other merchandise sold on which the percentage of sales of such items is to be computed, shall always and in each instance be the gross purchase price agreed to be paid for the same by the individual respective purchaser, less any sum agreed to be deposited from each such sale for perpetual care and maintenance purposes, and also less any service or carrying charge, and also less the actual cost to SECOND PARTY of any insurance premiums, bonuses, et cetera, agreed by SECOND PARTY to be provided to the purchaser in addition to the memorial or grave marker *188 or other merchandise, which premiums, bonuses, et cetera, are used to induce sales. 4. The parties hereto agree that the percentages of sales required hereby to be paid to FIRST PARTIES, and the right to receive the same, as set out in paragraph numbered "2" hereof, shall be divided into One Hundred (100) equal parts and SECOND PARTY agrees to issue to and deliver to FIRST PARTIES registered Certificates of Indebtedness representing such parts, in the denomination as may be requested by FIRST PARTIES and the said Certificates of Indebtedness shall be personal property and shall be transferable by the FIRST PARTIES, or any registered holder thereof, or their representatives or assigns, only upon the books of the SECOND PARTY upon the surrender of said Certificates of Indebtedness of which such transfer is desired. Each Certificate of Indebtedness, and the registered holder thereof, shall be entitled to the pro rata share of the percentage of sales provided to be paid in paragraph numbered "2" herein that the units of interest of each Certificate bears to the total of One Hundred (100) equal parts or units. Said Certificates of Indebtedness shall be designated "Series RP". * * *189 *
Pursuant to said agreement, Billings issued on the same date a registered Certificate of Indebtedness to Peterson. The pertinent parts of said certificate read as follows: This is to certify that D. J. PETERSON is entitled to an interest equal to Fifty One Hundredths (50/100ths) in Ten (10%) per cent of the proceeds represented by the sale of all lots and grave spaces, and also in Ten (10%) per cent of the proceeds represented by the sale price of family memorials, grave markers, and any items of merchandise sold by the undersigned, in, from, and in connection with Sunset Memorial Gardens, a cemetery situate in Yellowstone County, Montana, during the period of time beginning on the 28th day of February, 1955, and continuing thereafter until all the lots, grave spaces and burial rights contained in said land, and any additions thereto, are sold, all as set forth and in accordance with an agreement between Edwin Rath and D. J. Peterson, on the one part, and Sunset Memorial Gardens of Billings, Inc., on the other part, dated the 28th day of February, 1955, which said agreement is incorporated herein by reference. Such proceeds from said sales shall constitute the additional land *190 purchase and financing fund of Sunset Memorial Gardens of Billings, Inc. and shall be accumulated only out of the last Fifty (50%) per cent of the sale price to the undersigned on each burial space on account of each such sale. Sunset Memorial Gardens of Billings, Inc. shall be liable to the holder of this Certificate, and this Certificate shall be a lien on such additional land purchase and financing fund, to the extent of the interest represented by this Certificate; and the holder of this Certificate shall be entitled to have paid over to him such proportions of said fund as the number of units represented by this Certificate bears to the total number of One Hundred (100) units. Payments on account of this Certificate of Indebtedness shall after March 10th, 1955, be made on the tenth day of each month in each year, and shall continue only for such period of time as is necessary to pay out in full the amount accumulated in the additional land purchase and financing fund. After all such payments are made, the liability of Sunset Memorial Gardens of Billings, Inc. under this Certificate of Indebtedness shall terminate and the obligation represented by this Certificate shall be *191 discharged, and this Certificate shall be surrendered for cancellation. This Certificate is transferable only on the books of Sunset Memorial Gardens of Billings, Inc. by the original holder thereof in person or by his attorney, on surrender of this Certificate. * * *
The acceptance of the deed to the abovedescribed land by Billings and the execution of the documents entitled "Land Purchase Agreement" and "Certificates of Indebtedness" were approved by the board of trustees of Billings. Pursuant to the land agreement and the certificates of indebtedness, the return Peterson would receive bore a direct relationship to the financial success of the business. On at least three other occasions Peterson, together with Rath, purchased tracts of land and then transferred each tract of land to a different cemetery corporation. In each case the transfer of land to the cemetery corporation was made pursuant to a land purchase agreement similar in all material respects to the one set forth above. Then the corporations would issue registered certificates of indebtedness to Peterson similar to the one set forth above. The following table shows the corporations to which the land was transferred, *192 the date of transfer and the cost of the land to Peterson. Corporation
Date of Transfer
Cost
Billings
Feb. 28, 1955
$2,500
Sidney
Aug. 18, 1955
500
Lewistown
Feb. 7, 1956
750
Havre
Mar. 25, 1955
500 In each case the land, during the time it was held by Peterson and Rath, was not in any way improved. In each case all transfers of land by Peterson to the respective corporations occurred within 6 months after the acquisition of said property by Peterson. During the years 1957, 1958, and 1959 Peterson received $4,261.22, $10,392.24 and $8,125.65, respectively, as payments upon the certificates of indebtedness he owned. In every case all payments in issue for the years 1957, 1958, and 1959 which relate to certificates of indebtedness were made not less than 6 months after the certificates were issued. The foregoing payments were reported by Peterson on the returns in issue as long-term capital gain. None of the corporations involved herein has ever paid or declared any formal cash dividend during the years 1957, 1958 and 1959 or anytime subsequent thereto. All documents were drawn and all documents entitled "Registered Certificates of Indebtedness" *193 were drawn and issued by said corporations for the purpose of meeting the requirements of section 117(f) of the Internal Revenue Code of 1939, reenacted as section 1232 of the Internal Revenue Code of 1954. In his deficiency notices, respondent determined that the amounts received by Peterson as the owner of the certificates of indebtedness constitute ordinary income. Opinion Petitioners contend that the payments received with respect to their certificates of indebtedness are taxable as long-term capital gain under the provisions of section 1232. [3] Petitioners argue that there were bona fide sales of land to the four corporations here involved; that in consideration for the land, petitioners received registered certificates of indebtedness which did not have a determinable fair market value at the date of issue; that a debtor-creditor relationship was created so that the payments received by them on their certificates first are applied against their basis, and any excess payments over the basis represent capital gain. *194 Respondent, on the other hand, takes the position that the transfers of land in the four transactions here involved were in reality a contribution to the capital of the respective corporations. Respondent maintains that a bona fide debtor-creditor relationship never was intended to be created nor was one in fact created, that the certificates of indebtedness are in reality equity instruments, and that the payments received by petitioners during the years in issue represent dividends. Respondent points to the instruments themselves as a clear indication that they are not "debt instruments" in that they neither provide for the unconditional payment of any fixed sum nor do they provide for interest. We agree with respondent. The question we have to decide is whether or not the certificates of indebtedness received by petitioners on the transfers of land to the four corporations here involved constitute, for tax purposes, valid debt instruments. This very issue has recently been decided by this Court on facts almost identical with those herein. In Sherwood Memorial Gardens, Inc., 42 T.C. 211 (1964), on appeal (C.A. 7, Aug. 10, 1964), and Gardens of Faith, Inc., T.C. Memo. 1964-178, *195 affd. per curiam 345 F.2d 180 (C.A. 4, 1965), this Court found the certificates of indebtedness used therein were not true debt instruments but were instruments evidencing a proprietary equity interest in the nature of preferred stock. Nothing further could be accomplished by our restating the reasons for reaching such a conclusion. Petitioners herein have advanced no new arguments or theories which have not already been discussed and rejected by this Court in Sherwood Memorial Gardens, Inc., and Gardens of Faith, Inc., both supra. Accordingly, on the authority of Gardens of Faith, Inc., and Sherwood Memorial Gardens, Inc., we conclude that the certificates of indebtedness were neither in form nor in substance true debt instruments; that a debtor-creditor relationship was never intended to be established and thus the payments made by the corporations here involved during the years in issue are properly to be included in the gross income of petitioners as dividends received to the extent of the respective corporation's earnings and profits. [4]
*196 Decision will be entered under Rule 50. Footnotes
1. Donald J. Peterson is the only petitioner for the year 1957. By motion granted April 22, 1965, the case against Ruth M. Peterson for the year 1957 was dismissed for lack of jurisdiction.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.↩
1. In each case where Peterson owned shares of stock, it was nevertheless only a minority interest.↩
3. SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS. (a) General Rule. - For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof - (1) Retirement. - Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor * * *↩
4. The computation of the earnings and profits of the four corporations here involved can be accomplished under Rule 50.↩