THOMAS K. McMANUS and MARGARET F. McMANUS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McManus v. Commissioner
Docket No. 5356-77.
United States Tax Court
T.C. Memo 1981-196; 1981 Tax Ct. Memo LEXIS 552; 41 T.C.M. (CCH) 1322; T.C.M. (RIA) 81196; April 22, 1981. *552 Paul E. Anderson, for the petitioners. Jerome Borison and Rebecca T. Hill, for the respondent. TIETJENS
MEMORANDUM FINDINGS OF FACT AND OPINION TIETJENS, Judge: * Respondent determined a deficiency of $ 106,118 in petitioners' Federal income tax for 1973. The only issue is whether petitioners are entitled to capital gains treatment for the sales of two parcels of Tract 2347. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. At the time they filed their petition, petitioners resided in Berkeley, California. Petitioners filed a joint Federal income tax return for 1973 with the Internal Revenue Service in Fresno, California. In 1961, petitioner Thomas K. McManus (McManus), John C. Gutleben (Gutleben), and Nelson A. Chick (Chick) purchased Tract 2347, property consisting of 36-1/2 acres. These three men were all experienced in the construction engineering business and had begun working with each other *553 by 1937. At the time of purchasing this tract, the men intended to have an industrial and commercial development built around the proposed Holiday Inn, which property was not a part of Tract 2347. They had hoped to develop the tract completely within ten years. Soon after they purchased this tract, they applied for and received approval to subdivide the land into 14 separate plots and a street intersecting the property. Between March and September, 1962, the taxpayers paid approximately $ 240,000 to improve the property. Shortly after they acquired Tract 2347, a market analysis, prepared by Stanford Research Institute at the three men's request, showed a pessimistic outlook for rental or leasing of this property. In 1965 or 1966, the State of California condemned a portion of this tract and this event aggravated the poor prospects of leasing. By 1972, any momentum for developing this tract had dissipated. [1]
*554 By the end of 1970, 14 sales or exchanges were made on lots of Tract 2347. [2] Through 1970, the taxpayers did not generate most of the sales of parcels of this tract; rather, because they held themselves out to be purveyors of raw land, they were known in the real estate community to be holding these lots for sale and thus prospective buyers would contact them. Specifically, McManus indicated that they had received possibly 100 inquiries regarding lot sales from this tract between 1962 and 1973. *555 MGC Company, a construction company incorporated in 1956 by McManus, Gutleben, and Chick, had constructed 3 buildings on the lots of Tract 2347 sold through 1970: for the International Brotherhood of Boilermakers, the Carpenters' Union, and the Blue Chip Stamp. On July 18, 1972, McManus, Chick, and Gutleben transferred title, by means of a "Holding Agreement," to the portions of Tract 2347 which were sold in 1973 to Title Insurance and Trust Company whose sole and exclusive responsibility was to convey title to the property as directed by any one of these three men. On February 15, 1973, Lot Number 6 of Tract 2347 was sold to the Boy Scouts of America (BSA) for $ 137,880, [3] resulting in a realized gain of $ 97,742. [4] In the fall of 1972, Mr. Emerald, an agent for BSA, approached McManus about the possibility of making this purchase. During the negotiations with BSA, McManus and Chick indicated that they desired to erect a building on the property and, indeed, MGC Company, constructed a building for the organization incident to this sale. *556 On August 7, 1973, all but one [5] parcel of Tract 2347 was sold to Continental Development Company (CDC) for $ 1,500,180, resulting in a realized gain of $ 960,749. [6] In connection with this sale, real estate commissions were paid to Grubb and Ellis (G & E). In February, 1973, Ray Wentworth (Wentworth), a real estate agent for G & E, came to McManus with an offer from CDC which McManus refused. McManus was not interested in selling at this first offer price and it was only on Wentworth's initiative that negotiations were continued and an agreeable price finally achieved. In 1973, Richard Hall received $ 15,000 from these men for his services in reviewing the offer that was made by CDC as well as other offers that were received in 1971 and 1972. Gutleben died on September 5, 1972 and Chick died in February, 1975. Chick, who was mostly a silent *557 partner and who relied on McManus for decisions on this tract of land, [7] had had serious strokes dating back to the 1950's and, in 1973, was in ill health. Prior to Gutleben's death, there were no offers to purchase the entire Tract in a bulk sale. In the two sales involved herein, the sellers made no active solicitation of purchasers. In 1973, McManus was president of MGC Company and vice-president of the Underground Construction Co. (UCC). [8]
Estate taxes of $ 242,583.54 were due on Gutleben's estate as of August 5, 1973. Gutleben's estate received distribution of the proceeds from the sale to CDC on August 7, 1973. Gutleben's estate paid estate taxes of $ 214,209 on September 17, 1973 and $ 27,070.05 on November 18, 1974. OPINION Petitioners argue that, because of the need for funds to satisfy the estate taxes owing by Gutleben's estate, the two 1973 sales were made in liquidation of a tenancy in common among *558 McManus, Gutleben, and Chick, that the CDC sale was in bulk, and that, consequently, gains from these sales are entitled to capital gains treatment. Respondent argues that since in McManus v. Commissioner, 65 T.C. 197 (1975), affd. 583 F.2d 443 (9th Cir. 1978), we held that, for the years 1968 through 1970, McManus, Gutleben, and Chick were a partnership engaged in the real estate business and that they held Tract 2347 primarily for sale to customers in the ordinary course of its trade or business, petitioners, in order to prevail here, must show a change in 1973 from the manner in which the property was dealt with through 1970. He contends that the number of sales per year, the nature and extent of the development of the sales, the percentage of profit, the types of offers considered, the use and nonuse of real estate brokers, the construction activity of MGC Company in conjunction with some of the sales and not with others all indicate that their manner of dealing remained the same; Gutleben's death and Chick's illness, he asserts, were events which did not affect their method of dealing with Tract 2347. Respondent proceeds that rather than a *559 liquidation occurring here, the partners merely fulfilled their intention to sell the property over a long period of time, obtained the prices they thought fair, and still retained a portion of Tract 2347. Finally, respondent maintains that petitioners' liquidation argument avoids the issue of whether the liquidation, if any, was of a capital asset or of an asset held for sale in the ordinary course of business. We agree with respondent. Under the definition provided in section 1221(1), the term "capital asset" does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." "[P]rimarily," as used in section 1221(1), means "of first importance" or "principally" and not merely a substantial purpose. Malat v. Riddell, 383 U.S. 569, 572 (1966). In addition, section 1221(1) requires that the sale be part of the everyday operations of the business and not the realization of an increase in value which has accrued over a long time. Malat v. Riddell, supra; Bynum v. Commissioner, 46 T.C. 295, 302 (1966) *560 (concurring opinion by Judge Tannenwald). The issue of whether property is held as a capital asset or for sale to customers in the ordinary course of a trade or business is a factual question. Bauschard v. Commissioner, 279 F.2d 115, 117 (6th Cir. 1960), affg. 31 T.C. 910 (1959); McManus v. Commissioner,supra at 211. Factors most often considered include the (1) nature and purpose the property was acquired and how long it was subsequently held; (2) a characterization of the taxpayer's attempts to sell the property; (3) the number, extent, continuity and substantiality of sales; (4) the amount of subdivision, development and advertising the property for sale; (5) the use of a business sales office; (6) the type and extent of control exercised by the taxpayer over any sales agent; and (7) the time and effort the taxpayer customarily applied to the sales. United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); McManus v. Commissioner, supra at 211. Being a departure from the normal tax rates, capital gains provisions are to be construed narrowly. Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955). *561 After reviewing these factors, in McManus v. Commissioner, supra, we held that for the years 1968 through 1970, McManus, Gutleben, and Chick held parcels of Tract 2347 primarily for sale to customers in the ordinary course of their business. The purpose for which the property is held at the time of sale, however, determines the taxable nature of the gain, Bynum v. Commissioner, supra; therefore, while our findings in McManus v. Commissioner, supra, are conclusive as to the years 1968 through 1970, we must decide whether there was any change in the manner in which petitioner dealt with Tract 2347 between those years and 1973. [9] See Thompson v. Commissioner, 38 T.C. 153 (1962), affd. on this issue 322 F.2d 122 (5th Cir. 1963). *562 After reviewing the evidence, we find that there was no difference in the manner of dealing between the sales in 1973 and those made in the earlier years. All subdivision and improvements were completed by 1962. Two sales were made in 1973 while in the three prior years between one and three sales were made. MGC Company built a building on the parcel sold to BSA but no building was constructed on the property sold to CDC; similarly between 1968 and 1970, MGC built a building on one of the lots while the other five remained undeveloped. The percentage of profits from the two sales in 1973 amounted to, approximately, 178 and 244 percent as compared to between, approximately, 137 percent and 332 percent for sales between 1968 and 1970. A real estate broker was used in the sale to CDC but not to BSA just as brokers were used in only two of the six sales made between 1968 and 1970. The partnership seriously considered many offers to lease the property both prior and subsequent to 1971. Finally, characteristic of all of the sales of Tract 2347, there was no solicitation by the owners; instead, the sellers relied on the general knowledge in the real estate community that they held *563 parcels of Tract 2347 for sale and in 1973, as in all previous years, prospective buyers approached them. Cases that have found a change in purpose include situations where there has been a sudden need for cash, [10] and where there is a liquidation of holdings. [11]
Petitioners contend that taxes were due on Gutleben's estate and that money was needed to pay them. Petitioners, however, have not persuaded us, e.g., that McManus himself needed cash, that the other two men could not have bought out Gutleben's share, and that the sale of Gutleben's interest in UCC did not generate sufficient funds to pay these expenses. Even more significantly, we do not perceive any urgency with respect to either the sale to BSA or to CDC. The sellers did not initiate any of the sales and by refusing CDC's first offer and by *564 not contacting them afterwards, by waiting until they received a good profit percentage for the property, we find that petitioners have not shown that circumstances had changed. It appears just as likely to us that the sellers would have continued to hold the property for the next few years until they were offered a good deal. [12]
Petitioners also argue that the sale to CDC was a bulk sale and a liquidation of their holdings. They cite McManus' testimony that he was burdened with serving as president of MGC Company and as vice president of UCC coupled with the facts of Gutleben's death and Chick's ill health as indications that they were liquidating their holdings in Tract 2347. We are, however, still unconvinced. Firstly, we do not see how this reasoning applies to the sale of BSA. Further, the fact of no solicitation of sales, the sale to CDC at their usual profit margin, the retention of one parcel of Tract 2347, the intention at the outset of this venture, in 1961, to sell the lots over approximately a ten year *565 period, the lack of change in the manner they dealt with the property, and McManus' continuous involvement with MGC and UCC in prior years, all indicate the lack of intention to liquidate their holdings. That more lots were included in this sale, since no prior offers for bulk sales were made, does not prove that the sellers wanted to liquidate their holdings; considering the nature of the dealings between the sellers and CDC and the manner of all prior dealings, it is equally plausible that this sale involved more lots than other sales because CDC merely wanted to purchase a larger piece of property. Finally, a liquidation may be one of an investment asset or of an asset in the ordinary course of business. If the seller is in the real estate business and merely sells his last piece of property carrying on the sale in the same manner in which his business is ordinarily conducted, the sale is not entitled to capital gains treatment. Home Co. v. Commissioner, 212 F.2d 637, 641 (10th Cir. 1954), affg. a Memorandum Opinion of this Court. We find that the two 1973 sales of *566 Tract 2347 were sales of property held primarily for sales to customers in the ordinary course of business. Petitioners, therefore, must recognize their portion of the gain from these sales as ordinary income. Decision will be entered under Rule 155. Footnotes
*. This case was heard by Judge William H. Quealy. Due to Judge Quealy↩'s resignation from the Court, the case was reassigned.
1. In 1971 and 1972, the three men negotiated with General Motors for the construction of a building on about six acres of Tract 2347 for rental purposes but no agreement was reached between the parties. In 1972, they negotiated with National Stereo Stores for the possibility of building on and leasing a portion of Tract 2347 but again no agreement was achieved. Subsequent to Gutleben's death, serious negotiations, including consideration of the type of building wanted by the company, of the value of the property, and of the type of lease and activities allowable, were entered into with Ortho Matress Company to lease a portion of the Tract. In 1973, other plans under consideration included exchanging a portion of Tract 2347 for property held by Rhodes and Jamieson, leasing a building to Builders' Exchange, and leasing a portion of Tract 2347 with a building on it to Travelodge International Corporation.↩
2. Sales
Gross
Broker
Year
Purchaser
Price
Profit
Used
1962
Three Companies (Holiday Inn Hotel)
$ 275,000
$ 115,527
No
1962
Shell Oil Company
89,000
37,389
No
1962
Standard Oil Company
100,000
42,000
Yes
1962
City of Oakland
31,000
13,065
Yes
1964
R. and D. Bardell (Foster's
Freeze Restaurants)
90,586
38,055
Yes
1965
Transferred to Real Estate Joint
Holdings (Blue Chip Stamp) *
No
1967
United Brotherhood of Carpenters
77,963
49,993
Yes
1967
Gulf Oil Company
150,000
111,859
Yes
1968
Radio Corporation of America
73,406
42,482
Yes
1968
State of California
308,900
200,989
No
1969
Radio Corporation of America
22,500
16,230
No
1970
International Brotherhood of
Boilermakers
92,531
71,111
Yes
1970
California Dept. of Motor Vehicles
312,500
221,636
No
1970
Shell Oil Company
Exchange
67,421
No
n* In 1965, MGC transferred a parcel in Tract 2347 to a partnership, Real Estate Joint Holdings (REJH). The three equal partners of REJH were McManus, Gutleben, and Chick. Subsequently, a building was erected on the parcel and leased to Blue Chip Stamp Co. In 1967, the "Blue Chip" building was sold by REJH to Warren and Lucile Simpson for a sale price of $ 235,000. REJH realized a profit on the sale in the amount of $ 68,477.↩
3. On April 8, 1972, Gutleben had prepared a schedule showing the values these men placed on the remaining parcels of Tract 2347. The value given Lot 6 was $ 137,890. On the sale to BSA, McManus realized a gain of one-third or approximately $ 32,580.67.↩
4. Respondent concedes that the sale of Lot 6 was properly reported under the installment method pursuant to section 453(b), 1954 I.R.C.↩, as amended. 5. As of the date of the trial, McManus, Gutleben, and Chick, held an interest in this property which was then being leased to a restaurant. The property had been vacant for approximately two years and had only been rented out again to its new operators in November, 1977. ↩
6. McManus realized a gain of one-third or $ 320,249.↩
7. Chick had, at one time, given McManus his power of attorney.↩
8. UCC was originally owned mainly by McManus, Gutleben, and Chick. In 1968, Chick disposed of his entire interest in UCC and on Gutleben's death, UCC purchased Gutleben's interest.↩
9. Petitioners have argued that the doctrine of collateral estoppel is not applicable because of the change in circumstances here. Respondent has not pursued a contrary argument and we agree with petitioners on this issue. The prior judgment in McManus v. Commissioner, supra, serves as collateral estoppel only regarding matters in this suit which were actually determined in the earlier case. See Commissioner v. Sunnen, 333 U.S. 591 (1948); Southern Pacific Transportation Co., 75 T.C. 497 (Dec. 31, 1980); Lea, Inc. v. Commissioner, 69 T.C. 762↩ (1978).
10. See, e.g. Gardens of Faith, Inc. v. Commissioner, T.C. Memo. 1964-178, affd. per curiam 345 F.2d 180 (4th Cir. 1965); Havener v. Commissioner, T.C. Memo. 1964-91↩. 11. See, e.g. Biedermann v. Commissioner, 68 T.C. 1 (1977); Est of Knudsen v. Commissioner, T.C. Memo. 1980-216↩.
12. For the property sold to BSA, the sellers received almost precisely the figure they estimated the property to be worth about ten months prior to the sale.↩